Jolana S. BRADSHAW

v.

The UNITED STATES.

CASTLEWOOD, INC.

v.

The UNITED STATES.

Lori SWIFT, By her Mother and Next Friend, Frances H. Swift

v.

The UNITED STATES.

Stephen T. and Brenda J. SWIFT

v.

The UNITED STATES.

ESTATE OF Thomas E. SWIFT, deceased.

Frances H. SWIFT and Stephen T. Swift, Co-Executors, and Frances H. Swift

v.

The UNITED STATES.

Nos. 472–77 to 476–77.

United States Court of Claims.

June 30, 1982.

---

Jan Tore Hall, Chattanooga, Tenn., for plaintiffs. Hunter D. Heggie, Chattanooga, Tenn., attorney of record.

Donald P. Lan, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D. C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and BENNETT, Judges.

OPINION

BENNETT, Judge:

These consolidated tax refund cases are before the court on a Memorandum Report Returning Case to Court on Stipulation of Facts, filed by the trial judge pursuant to Rule 134(b)(2) on February 20, 1981. The essential facts stipulated are set forth below. Castlewood, Inc. (Castlewood), plaintiff in No. 473–77, is a cash method taxpayer and seeks a refund of federal income taxes and interest thereon paid with respect to its taxable years ended July 31, 1971, and July 31, 1972. Jolana S. Bradshaw (Jolana), plaintiff in No. 472–77, Lori Swift (Lori), plaintiff in No. 474–77, and Stephen T. Swift (Stephen), plaintiff in No. 475–77,[1] are cash method, calendar year taxpayers. Each seeks a refund of federal income taxes and interest thereon paid with respect to their taxable years ended December 31, 1972. Frances H. Swift (Frances), plaintiff in No. 476–77,[2] is also a cash method taxpayer and seeks a refund of federal income taxes and interest thereon paid with respect to her taxable years ended June 30, 1971, and June 30, 1972. These five actions were consolidated by order entered January 19, 1979, by the trial judge. The aggregate recovery sought is $81,400.38, plus assessed and statutory interest.

Both parties agree that there are only two questions for decision. The first is whether the transfer of real property to Castlewood, a controlled corporation, in exchange for installment obligations was a sale of the property to that corporation or, instead, was either a transfer of property to a controlled corporation solely in exchange for stock or securities of that corporation within the meaning of section 351[3] or a capital contribution to that corporation. The second question is whether more than 20 percent of the gross receipts of SJL, Inc. (SJL), a second controlled corporation, constituted passive investment income within the meaning of section 1372(e)(5) so as to terminate that corporation's status as a subchapter S corporation, thereby causing distributions from SJL to Jolana, Lori, Stephen and Frances to be treated as dividends.

We find that the transfer of real property to Castlewood in exchange for installment obligations was a sale rather than a transfer governed by section 351 or a capital contribution. We also find that the passive investment income received by SJL did not exceed 20 percent of its gross receipts and, therefore, that its subchapter S status was not terminated. Accordingly, we hold for the plaintiffs and against the defendant for the reasons hereafter stated.

I

On January 6, 1961, Thomas E. Swift (Thomas) purchased a tract of land, consisting of approximately 200 acres, in Dalton, Whitfield County, Georgia, for $60,000. Two dispositions of property out of this 200 acres were made by Thomas in the summer of 1968. The consolidated cases herein concern one of these dispositions, the transfer of 40.427 acres, subsequently known as Castlewood Subdivision (the subdivision), to Castlewood on July 29, 1968. The conservative fair market value of the subdivision on the date of transfer was $250,000.[4] Thomas' adjusted basis in this portion of the property was $8,538. In exchange for the transfer, Thomas received from Castlewood five promissory notes (the Castlewood

---

1. Brenda J. Swift is a party to No. 475–77 solely by virtue of having filed a joint income tax return with her husband, Stephen T. Swift.

2. The estate of Thomas E. Swift, by its co-executors, Frances H. Swift and Stephen T. Swift, is a party to No. 476–77 solely by virtue of Thomas E. Swift having filed a joint income tax return with his wife, Frances H. Swift.

3. 26 U.S.C. § 351 (1976). All section references are to the Internal Revenue Code of 1954,

as in effect during the tax years in issue, unless otherwise indicated.

4. No independent appraisal was made of Castlewood Subdivision at the time it was transferred to Castlewood. Thomas' evaluation of the fair market value of the property and of the prospects for its successful development were based upon his knowledge of the Dalton, Georgia, real estate market, including sales of other real estate in the vicinity of the subdivision.

notes), each in the principal amount of $50,-000 and bearing interest at the rate of 4 percent per annum. The first note matured on January 29, 1971, with each successive note maturing at 1-year intervals. Thomas received no down payment for the transfer, and no security or other collateral was taken for the purchase price. He elected to report his gain from the transaction on the installment method pursuant to section 453(b).

At the time of transfer, various opportunities were available to Thomas to dispose of the subdivision, including sale to third parties. While he had not developed property himself, Thomas was highly expert in real estate matters in the Dalton area. Based upon this knowledge, including knowledge of sales of other real estate in the vicinity of the subdivision, Thomas evaluated the prospects for the development of the subdivision to be bright, whether such development was undertaken by himself, by a corporation that he might organize, or by a third party. He considered the alternative opportunities available to him to dispose of the property and decided to develop the property himself through a corporation rather than sell it to a third party.[5]

Consequently, Castlewood was organized and incorporated on July 29, 1968, under the laws of the State of Georgia, to obtain, subdivide, develop and sell lots in the subdivision. On July 29, 1968, Castlewood issued its Certificate No. 1, representing 50 shares of common stock, to Thomas in exchange for the transfer to the corporation of an automobile valued at $4,500. At all times relevant herein, Thomas was the sole shareholder of Castlewood[6] and was responsible for conducting its business affairs. His expertise was available to and utilized by the corporation in its development of the subdivision, enabling it to minimize development costs and thus increase profits.

The expected source of income and anticipated profit of Castlewood, and the expected source of payment of the five notes, with interest, was from the sale of the lots in the subdivision. At the time of the transfer to the corporation, Thomas anticipated that when developed, lots from the subdivision could be sold at a profit by the corporation and that the amount of such profit would increase over time. He had a plan for the development of the property which was timed so as to take full advantage of the opportunities for profit. He further anticipated that the development of the property would succeed and yield a profit to the corporation in the range between $100,000 and $150,000. He expected a positive cash flow to the corporation within about a year and a half, thereby providing sufficient funds to pay the first of the notes, due in January of 1971, and that the corporation could in the regular course of its business pay the five notes as they came due.

Because of the growing character of, and need for housing in, the Dalton, Georgia area, the value of the subdivision was, at all times relevant herein, increasing. In fact, the character and location of the subdivision was such that the property could reasonably be anticipated to be readily marketable at its development. If, however, the subdivision had not been developed, or if the development process had been slowed,

---

5. It is admitted that Thomas was aware of the different tax consequences that would attach to a sale of the subdivision, as opposed to a capital contribution of the property, to the corporation he might organize. In utilizing a corporate form to obtain the property, he sought to realize his accumulated gain in the property through the date of transfer, and by using a corporation to develop and sell lots from the property, he sought to limit his personal liability in order to insulate other noncorporate businesses in which he was involved.

6. In fact, at all times prior to his death, Thomas was the sole shareholder of Castlewood. On November 14, 1968, Castlewood issued its Certificate No. 2, representing 27 shares of common stock, to Thomas in exchange for the transfer to the corporation of $3,200 cash. Except as thus noted, Castlewood received no further capital contributions, designated as such, and issued no additional stock. Thomas died on August 25, 1974. Thereafter, his estate was the sole shareholder of the corporation. On September 23, 1976, Castlewood was liquidated, all of the assets and liabilities being acquired by the estate. Castlewood has remained formally in existence solely for purposes of this litigation.

Castlewood could have borrowed the money against the property to pay off the notes.

Prior to the creation of Castlewood and the transfer of the property thereto, Thomas estimated that development costs for the subdivision would be approximately $50,000. He anticipated that he would have a ready source of funds from C & S Concrete Products Company (C&S) to meet these development expenses. C&S was a partnership formed by Thomas, which was engaged in the manufacture of concrete products used in the building trade. At all times relevant herein, C&S was wholly owned directly or beneficially by Thomas, his wife, Frances, and their three children, Jolana, Lori and Stephen. Thomas' drawing account on C&S was, in essence, his personal bank account. Thomas had no personal bank account, and when using funds from his drawing account at C&S, he was in effect using his own personal funds.

As expected, the corporation's development expenses were primarily funded through advances from the partnership, totalling $34,116.10, at various times from August 31, 1968 through August 10, 1970.[7] These advances were treated as interest-free loans by both parties and were charged to an open account on the books of C&S. The partnership took no collateral or other security interest. The loans were repaid in four installments over an 8-year period.

Castlewood subdivided the subdivision into two tracts. Tract I consisted of 26 lots. Tract II consisted of eight lots. Each lot averaged approximately one acre. Lots were not formally offered for sale nor were any lots sold during the corporation's first two fiscal years (ended July 31, 1969, and July 31, 1970). Thomas was contacted by

parties wishing to purchase lots before the development was completed, but before commencing the development, he had decided that no lots would be sold until all of the planned development activities had been completed. This was because, among other reasons, he did not want anyone coming onto the property and cutting up the roads that he had put in, to install subsequent improvements such as water lines. All of the improvements made by Castlewood were completed before any of the lots were sold or offered for sale.[8] Except for paving on two lots and surveying, the eight lots in Tract II were essentially undeveloped. From August 1970 to April 1973, Castlewood sold 16 lots in Tract I and two lots in Tract II for an aggregate sales price of $239,880. It did not advertise the sale of these lots, use realtors, or pay sales commissions. The property sold had an allocated land cost (of the $250,000 purchase price) and development cost of $159,378.39, yielding a net return to the corporation of $80,501.11. Castlewood reported sales of lots on its federal income tax returns for the fiscal years ended July 31, 1971, July 31, 1972, and July 31, 1973.[9]

Subsequent to its 1973 fiscal year, Castlewood, upon the advice of its accountant, decided to cease selling lots in the subdivision as a result of the position taken by the Commissioner of Internal Revenue (Commissioner) on audit. During the period when no sales were made, both Thomas and his son Stephen were contacted by parties seeking to purchase lots. Castlewood reported no income from operations for its remaining fiscal years and was liquidated on September 23, 1976.[10] Castlewood never paid any salaries or declared or paid any dividends.

7. Castlewood also borrowed $521.94, interest free, from Thomas in November 1968 for the payment of the 1968 real estate taxes on the subdivision. This amount was repaid in full on September 18, 1972.

8. Improvements included paved streets, sewers and utilities. Castlewood did not construct residences on the lots; this was done or arranged by the purchaser of each lot.

9. As stated at the outset, only the 1971 and 1972 fiscal years of Castlewood are in issue in this litigation.

10. Subsequent to the liquidation, Thomas' estate sold all but three of the lots remaining in Tract I and all but four of the lots remaining in Tract II for a total sales price of $170,000. This property had an allocable land cost (of the $250,000 purchase price) and development cost of $75,239.43, yielding a net return, over the corporation's original cost, of $94,760.57.

On December 21, 1970, prior to the time that the first Castlewood note became due, Thomas organized and incorporated SJL. This corporation was formed by Thomas as part of his estate planning and was established in order to provide funds and opportunities for dealings in and the development of real estate and related activities by his children.[11] Its formation in December of 1970 was precipitated by the fact that the first Castlewood note was due in January of 1971. On December 28, 1970, Thomas transferred to SJL the five Castlewood notes in exchange for all of the stock of SJL in a transaction qualifying for nonrecognition of gain under section 351. On December 29, 1970, and January 4, 1971, he made equal gifts of all of the stock of SJL to his wife and three children, so that after the gifts each owned one-fourth of the corporation.

On or about January 19, 1971, SJL filed an election under section 1372(a) for status as a small business corporation (subchapter S corporation). This election was accepted by the Commissioner on February 1, 1971.

The note due January 29, 1971, was paid by Castlewood as due, together with $5,000 interest, to SJL. The note due January 29, 1972, was paid on January 31, 1972, together with $7,000 interest. The note due January 29, 1973, was paid on February 14, 1973, together with $9,000 interest.[12] The funds needed by Castlewood to repay the notes, plus interest, were generated solely from the sales of lots in the subdivision. Castlewood deducted the interest payments made to SJL on its relevant corporate income tax returns. On its subchapter S income tax

returns for the 1971, 1972 and 1973 fiscal years, SJL reported the payments it received from Castlewood as long-term capital gain to the extent the principal of each note exceeded its adjusted basis in the note. Consistent with its subchapter S status, SJL paid no tax on this income or on the interest income received from Castlewood. Rather, the shareholders, Frances, Jolana, Lori and Stephen, reported and paid taxes on their allocable share of the long-term capital gain and interest income received by SJL.

On May 14, 1971, SJL distributed $4,000 to Jolana, Lori and Stephen and $2,000 to Frances. On January 31, 1972, SJL distributed $23,000 to Jolana, Lori and Stephen and $25,000 to Frances.

By statutory notice of deficiency dated September 20, 1976, the Commissioner determined that additional income tax was due from Castlewood for its 1971 and 1972 tax years, for the reason that the transfer of the subdivision to that corporation by Thomas was not a sale, as treated by the corporation on its tax returns, but rather a transfer of property solely in exchange for stock or securities within the meaning of section 351. Thus, he concluded that, pursuant to section 362, Castlewood's predevelopment basis in the property was equal to that of the transferor immediately before the transfer, or $8,538. This, in turn, increased Castlewood's taxable income on sales of lots. Additionally, the Commissioner concluded that no debtor-creditor relationship was established between Castlewood and Thomas, thereby disallowing certain deductions of interest paid to SJL on

11. SJL, at various times, considered various real estate transactions, but never invested in nor acquired real estate or options for real estate, or otherwise consummated any transactions or engaged in any business with third parties as a result of considering those transactions.

12. During its 1971, 1972 and 1973 fiscal years, SJL had no receipts other than the payments on the notes from Castlewood, including interest. Subsequent to its 1973 fiscal year, Castlewood decided, on the advice of its accountant, to postpone payment of the final two notes held by SJL. This decision was based on the

uncertain tax effect of payment resulting from the positions taken by the Commissioner on audit. SJL has never made demand for payment or attempted to collect the final two notes, but rather agreed to extend the time for payment, pursuant to the advice of its accountant, based upon the uncertainty of the tax treatment which would be accorded it, as payee, upon the payment of any amount with respect to the notes. No written agreements evidenced this extension, and no interest or advance interest was paid in connection with this extension.

the notes taken for the purchase price of the property.

By statutory notice of deficiency dated September 20, 1976, the Commissioner determined that additional income tax was due from each of Jolana, Lori and Stephen for their 1972 tax years and from Frances for her 1971 and 1972 tax years. The Commissioner concluded that SJL no longer qualified as a subchapter S corporation because more than 20 percent of its gross receipts (amounts received as payment on the Castlewood notes) constituted passive investment income within the meaning of section 1372(e)(5). Accordingly, the distributions made by SJL to each shareholder,[13] and reported as interest income and long-term capital gain, were actually taxable as dividends, due to the termination of SJL's subchapter S status.[14]

Assessments of tax and interest were made on February 9, 1977, which were promptly paid. Claims for refund were formally denied on July 6, 1977. Each plaintiff filed a timely petition with this court on September 26, 1977.

## II

The first question concerns the proper tax treatment of Thomas' transfer of the subdivision to Castlewood in exchange for the five $50,000 promissory notes. If the transfer is treated as a sale, as plaintiff contends, then Castlewood's adjusted basis for its sales of the lots from the subdivision property would include the $250,000 purchase price (a cost basis), it would be allowed deductions of the interest paid on the notes and its taxable income would be gen-

erally as shown on its returns for the years in issue. However, if, as defendant claims, the transfer was not a sale but was either a transfer under section 351[15] or a contribution to the corporation's capital, then Castlewood's adjusted basis in the lots sold would be reduced to Thomas' original basis (a carryover basis) pursuant to section 362, it would be denied deductions of the interest paid on the notes and its taxable income would be generally as shown on the notice of deficiency issued with respect to it.

The sale versus capital contribution problem arises from a situation which often confronts taxpayers with holdings in undeveloped real estate. It is not uncommon for a landowner with a large tract of land suitable for development to want to freeze as capital gain the appreciation in the value of the property that has accrued during its ownership. While an outright sale of the property achieves this result, it also deprives the landowner of any participation in the profits to be reaped from its ultimate development. On the other hand, if the landowner develops and sells the property himself, he runs the risk of being treated as a dealer of the property and any gain generated through sales, including the gain associated with the land's appreciation in value while undeveloped, is taxable to him at ordinary income rates. *See, e.g., Goodman v. United States*, 182 Ct.Cl. 662, 390 F.2d 915, *cert. denied*, 393 U.S. 824, 89 S.Ct. 87, 21 L.Ed.2d 96 (1968); *Suburban Realty Co. v. United States*, 615 F.2d 171 (5th Cir.), *cert. denied*, 449 U.S. 920, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980).

13. Only the January 31, 1972 distribution is in issue for Jolana, Lori and Stephen. As to Frances, the May 14, 1971 distribution is in issue with respect to her fiscal year ended June 30, 1971, and the January 31, 1972 distribution is in issue with respect to her fiscal year ended June 30, 1972.

14. A notice of deficiency was also issued to SJL for its taxable years ended November 30, 1971, and November 30, 1972. However, SJL is not a party to the proceedings in this court. Instead, SJL filed a petition in the United States Tax Court for a redetermination of its tax liability

for those years, due to an inadequacy of funds to pay the deficiencies asserted against it.

15. Section 351 provides in pertinent part:

"(a) *General Rule.*—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property."

In the face of such a dilemma, taxpayers have devised an apparently viable solution. By selling the real property to a controlled corporation, they can realize their capital gain on the appreciation which has accrued during their ownership and, at the same time, preserve their opportunity to later participate in the developmental profits as shareholders of the development corporation. Moreover, the corporation obtains a cost basis in the real property, thereby reducing the amount of ordinary income to be received from subsequent sales.

Not unexpectedly, the Commissioner has repeatedly challenged the characterization of such a transaction as a sale, instead maintaining that the transfer is, in reality, a capital contribution and that the transferee corporation is only entitled to a carryover basis for the property. *See, e.g., Burr Oaks Corp. v. Commissioner,* 365 F.2d 24 (7th Cir. 1966), *cert. denied,* 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967); *Aqualane Shores, Inc. v. Commissioner,* 269 F.2d 116 (5th Cir. 1959). The two principal reasons asserted for denying the desired tax treatment to the corporation have their origin in the dual subparts of section 362(a).[16] While the main thesis is that section 351 governs such a transaction and that the corporation's basis for the property is to be determined pursuant to section 362(a)(1), it is also maintained that, regardless of the applicability of section 351, the transfer to the corporation is, in substance, a contribution to capital and that the adjusted basis for the property is to be determined under section 362(a)(2).

Although often litigated, the courts which have considered the sale versus sec-

tion 351/capital contribution question have not always been careful to distinguish between these two separate arguments. Indeed, it is understandable that the analyses of these prior cases have been fraught with overlap, for both propositions require an examination of substantially the same criteria. However, since a decision for plaintiff on the capital contribution question does not necessarily dispose of the section 351 question,[17] our discussion proceeds in two stages. Initially, we consider the "sale" versus "capital contribution" distinction. Thereafter, we address defendant's contention that section 351 applies to the subject transaction because the Castlewood notes constituted "stock or securities" within the intendment of the statute.

■ The proper characterization of a transaction, as a "sale" or a "capital contribution," is a question of fact to be decided as of the time of the transfer on the basis of all of the objective evidence. *Gooding Amusement Co. v. Commissioner,* 236 F.2d 159, 165 (6th Cir. 1956), *cert. denied,* 352 U.S. 1031, 77 S.Ct. 595, 1 L.Ed.2d 599 (1957). While the form of the transaction is relevant, we are required to examine all of the pertinent factors in order to determine whether the substance of the transaction complies with its form. *Gregory v. Helvering,* 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935). The essential nature of the transaction is to be determined from a consideration of all of the surrounding circumstances. *Piedmont Corp. v. Commissioner,* 388 F.2d 886, 889 (4th Cir. 1968).

In this case, the objective evidence points to a sale.[18] First, and foremost, the price

---

**16.** Section 362(a) provides:

"If property was acquired on or after June 22, 1954, by a corporation—

"(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

"(2) as paid-in surplus or as a contribution to capital,

"then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer."

**17.** Application of section 351 is mandatory if all of the conditions precedent therefor are satisfied. *Pocatello Coca-Cola Bottling Co. v. United States,* 139 F.Supp. 912, 915 (D.Idaho 1956).

**18.** The fact that the subject transaction was between a corporation and its sole shareholder does not by itself support the characterization of the transaction as a contribution to capital. A shareholder may contract with his controlled corporation as long as the arrangement is fair and reasonable. *Ingle Coal Corp. v. United States,* 131 Ct.Cl. 121, 128–29, 127 F.Supp. 573,

paid for the subdivision reflected its actual fair market value. Since it has been stipulated that the value of the subdivision was $250,000, the very amount for which it was sold to Castlewood, the transfer cannot be considered a "pretextuous device" to divert the earnings and profits of the corporation, otherwise taxable as ordinary income, into sales proceeds taxable as capital gain. *Piedmont Corp. v. Commissioner*, 388 F.2d 886, 889 (4th Cir. 1968). The sales price did not constitute an inflated value for the property, and, thus, did not represent an attempt to transfer to Thomas any subsequent capital increment in the value of the property, nor any of the gain from its development. In this respect, the transfer was clearly a sale.

Additionally, the various formalities of a sale were strictly observed. The five instruments involved constituted negotiable instruments in the form of "notes" under Georgia law, Ga.Code Ann. § 109A–3–104 (1979), contained an unqualified obligation to pay the principal amount, with fixed maturity dates ranging from two and one-half to six and one-half years after the date of sale and bore a reasonable rate of interest. The notes were not subordinated to general corporate creditors and contained a means for collection at maturity, which was never utilized as the principal and interest were always paid as due until the Commissioner challenged the tax treatment of those payments. On these bases, the notes contained all of the traditional elements of sales-generated debt.

Even so, defendant asks that upon consideration of the economic substance of the transfer, the transaction be recast as a capital contribution. This is so, we are told, because Congress has dictated that no tax consequences shall attach to a transaction where direct ownership of property is changed into indirect ownership through a proprietary interest in a corporation. Thus, where the circumstances of a purported sale demonstrate that the transferor, in fact, retained a continuing interest in the property transferred, the transaction is more appropriately characterized as a capital contribution.

Defendant calls our attention to an alleged factual pattern to be discerned in those instances where it has been determined that the economic substance of a purported sale was actually a contribution to capital. In such cases, it is claimed, a newly formed, inadequately capitalized corporation received assets which were essential to its purpose, and which required at the outset substantial improvements to convert them into income-producing property. Whereas, in those cases holding that the transaction resulted in a sale, the transfer involved proven, income-producing assets. Defendant submits that the distinction drawn in these cases turns on the nature and degree of risk inherent in the transfer of unproven assets and that in such instances, because of the high degree of risk, the transferor is likely to have retained a continuing interest in the property transferred.

In the present case, defendant maintains, unproven real property was transferred to an untried, undercapitalized business in return for notes, which were to be satisfied from the proceeds expected to be generated through the sale of lots. From this, defendant urges that we conclude that the notes represented a continuing interest in the corporate business, for repayment was totally dependent upon the success of the enterprise.

We cannot quarrel with the policies underlying section 351, nor with its intended scope. However, even accepting defendant's premise that the prior cases can be meaningfully differentiated along the lines suggested, we are unable to agree with the conclusion defendant draws in this case. Rephrasing defendant's position, we are asked to find that the degree of risk herein was of the type normally associated with a capital contribution. Thus stated, the salient inquiry is whether the notes occupied the position of equity, the assets and prospects of the business being unable to assure payment of the debt according to its terms.

578, *cert. denied*, 350 U.S. 842, 76 S.Ct. 82, 100 L.Ed. 751 (1955).

■ Admittedly, the stipulated facts show Castlewood to have been a "thin" corporation. Its initial capitalization consisted entirely of an automobile valued at $4,500. The corporation then issued five notes, each in the face amount of $50,000, in consideration for the subdivision property. While an additional $3,200 was contributed to Castlewood 4 months later, in practical terms it had no funds of its own with which to conduct business, instead relying on advances totalling over $34,000 from C&S to develop the property. It cannot be refuted that Castlewood had a very high ratio of debt to equity. But the mere fact that a corporation is or is not thinly capitalized does not, per se, control the character of the transaction. *See Gyro Eng. Corp. v. United States*, 417 F.2d 437, 439 (9th Cir. 1969); *Piedmont Corp. v. Commissioner*, 388 F.2d 886, 890 (4th Cir. 1968); *Sun Properties, Inc. v. United States*, 220 F.2d 171, 175 (5th Cir. 1955). As these cases demonstrate, if the corporation is adequately capitalized for its intended purpose, then we are not prevented from treating the notes as valid debt.

The facts reveal that in addition to its formal capitalization, Castlewood anticipated having access to, did have access to, and utilized funds in the form of loans from C&S, the partnership owned by Thomas and his family, which served as Thomas' personal bank account. Castlewood also had access to an important resource in the expertise Thomas brought to the business, which allowed the corporation to minimize its development expenses. *See Murphy Logging Co. v. United States*, 378 F.2d 222, 224 (9th Cir. 1967). Given these resources, which were certainly adequate to finance the level of development activities undertaken, and the absence of any need to employ advertising or to use realtors, there was little reason for the corporation to maintain a large surplus of liquid capital. Under the circumstances, we cannot say that undercapitalization is fatal to plaintiff's position.

Integrally related to this discussion, as defendant recognizes, is the nature or quality of the risk assumed by the transferor. However, unlike defendant, we do not find the fact that what was sold to Castlewood was unimproved real estate to be necessarily indicative of a high degree of risk. Concomitantly, nor do we view repayment of the Castlewood notes to have been dependent upon the success of the business. Under the stipulated facts of this case, at the time of transfer, because of the character and location of the subdivision, there was a reasonable anticipation that the development of the property would succeed and yield a profit. And, as planned, the subdivision was developed, a cash flow generated and the notes paid, with interest, as due. While repayment from the receipts of the business was a logical necessity, repayment from the profits was not. A successful enterprise herein would have been one which realized a profit from its developmental activities, that is, one which generated income over and above the value of the property as purchased. And while that occurred, it was not from that success that the notes were paid, but from the value of the property which was there from the date of sale. It is of prime importance that the property was, at all times, saleable in its undeveloped condition.[19] At the time of transfer, there existed contemporaneous opportunities to sell the property to third parties. In fact, a portion of the original tract had been sold, undeveloped, to a third party immediately before the sale to Castlewood. The record does not support defendant's conclusion that the property required extensive improvements in order to convert it into an income-producing asset, or even to generate a cash flow. Although lots were not sold until development was finished,

---

**19.** Defendant makes the argument that if a creditor looks to the liquidation of the corporation's assets for payment, such is an indication that the true nature of his holding is that of a proprietary interest in the business. While this may be true in some instances, it is not necessarily so where the asset is readily marketable in its raw form. In the common situation, the asset must produce income for the creditor to be paid. Consequently, liquidation of the asset destroys the business. However, in this case, liquidation of the subdivision fulfilled the purpose of the business. Thus, repayment was part of the natural disposition of the asset.

this was merely by design. Prospective purchasers had sought to buy lots before development was complete and, once sales were commenced, lots were sold undeveloped. Moreover, at all times the value of the property was increasing, irrespective of its development, and, if necessary, the corporation could have borrowed the money against the property to pay off the notes. Clearly, it was always within Castlewood's ability to make payment as required. To be sure, as with any new venture, there was some risk of loss; but the evidence manifests that such risk was significantly reduced in this case. From the beginning, there existed a reasonable assurance of repayment of the notes regardless of the success of the business. To us, this is further indicia that the notes were debt, not equity. The facts just do not support the inference that, in holding the Castlewood notes, Thomas was assuming the risk of loss normally associated with equity participation.

We are referred by defendant to, among others, *Burr Oaks Corp. v. Commissioner*, 365 F.2d 24 (7th Cir. 1966), *cert. denied*, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967), and *Aqualane Shores, Inc. v. Commissioner*, 269 F.2d 116 (5th Cir. 1959), two of the leading decisions to hold a purported sale to be a contribution to capital. In *Burr Oaks*, undeveloped land, intended for subdivision, was transferred to a newly formed corporation for more than twice its fair market value. In exchange therefor, the transferors received back 2-year promissory notes. Development costs ran extremely high and sales of lots were, at best, slow. Consequently, the notes were only partially paid at maturity and new notes were given for the unpaid balance. Moreover, some of the property was eventually retransferred to the noteholders at little or no cost. On these facts, the Seventh Circuit had no difficulty affirming the decision of the Tax Court,[20] finding a strong inference that the transfer was an equity contribution where "payment to the transferors [was] dependent on the success of an untried undercapitalized business with uncertain prospects." 365 F.2d at 27. In *Aqualane Shores*, the land transferred to the development corporation was mangrove swamp. Thus, vast improvements were essential to its successful development, which, even then, was highly speculative. With its only source of revenue being the sale of lots, the corporation was forced to borrow substantial amounts of money in order to put the land in marketable condition. No payments on the notes taken back for the land were made for 4 years after maturity. On this basis, payment of the obligations to the transferors was deemed to be dependent upon and at the risk of the success of the venture, and the transfer subject to section 112(b)(5), the predecessor to section 351.269 F.2d at 119–20.

The evidentiary basis of the present case, as previously set forth, contrasts sharply with these decisions. Unlike either case, the prospects for financial success were bright, such success was realized, and the corporation was always able to meet its obligations as they matured. Moreover, the promise of repayment was never in jeopardy, for the properties' self-liquidating potential guaranteed that repayment of the notes would not be subject to the fortunes of the business. In all major respects, the present case is more analogous to *Piedmont Corp. v. Commissioner*, 388 F.2d 886 (4th Cir. 1968), than to either *Burr Oaks* or *Aqualane Shores*.[21] *Piedmont* involved successive transfers of options to purchase real property to a controlled corporation in exchange for unsecured promissory notes. The Fourth Circuit considered *Burr Oaks* and *Aqualane Shores*, but found both to be distinguishable.[22] In reversing the decision

---

20. 43 T.C. 635 (1965).

21. The only colorable distinction between *Piedmont* and the present case is that in *Piedmont* the transferee corporation had been organized several years before the contested transfer, but until that time had remained dormant with nominal assets. Inasmuch as section 351 and section 362(a) apply equally to existing, as well as to newly formed, corporations, we find this difference to be without significance.

22. The *Piedmont* court was persuaded that *Sun Properties, Inc. v. United States*, 220 F.2d 171 (5th Cir. 1955), was the correct precedent. In *Sun Properties*, a warehouse, which was gener-

of the Tax Court[23] that the transfers were in effect a contribution to capital, the following were held to be determinative: (1) the facts[24] indicated "some degree of certainty to the financial success of the venture"; (2) "a fair purchase price was paid"; (3) the corporation "paid the interest and installments of principal when due, promptly and regularly"; and (4) the corporation "did not retransfer any portion of any option, or any land which it acquired by exercise of an option" to the noteholders. Thereupon, the court concluded that "an evidentiary basis to disregard the purported sales as *bona fide* sales [was] lacking." 388 F.2d at 890–91.

These same factors appear in this case[25] and, accordingly, we choose to be guided in our deliberations by *Piedmont*, rather than by *Burr Oaks* or *Aqualane Shores*. As supported by the record and confirmed by *Piedmont*, the transfer was in substance, as well as in form, a sale and not a capital contribution.

Defendant's remaining contention is that, notwithstanding a determination that the Castlewood notes were valid debt, the subject transaction falls within the literal provisions of section 351. The specific requirement in issue is whether the notes were "securities" within the meaning of the statute.[26]

A transferor has received a security if the instrument taken back in the exchange represents a continuing proprietary interest in the transferee corporation. *Le Tulle v. Scofield*, 308 U.S. 415, 420, 60 S.Ct. 313, 315–16, 84 L.Ed. 355 (1940); *Pinellas Ice Co. v. Commissioner*, 287 U.S. 462, 470, 53 S.Ct. 257, 260, 77 L.Ed. 428 (1933). The test as to the "securities" status of debt obligations is set forth in *Camp Wolters Enterprises, Inc. v. Commissioner*, 22 T.C. 737 (1954), *aff'd*, 230 F.2d 555 (5th Cir.), *cert. denied*, 352 U.S. 826, 77. S.Ct. 39, 1 L.Ed.2d 49 (1956):

> The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an overall evaluation of the nature of the debt, degree of participation and continuing interest compared with similarity of the note to a cash payment, the purpose of the advances, etc. [22 T.C. at 751.]

Defendant contends that the present case is not materially different from the situation in *United States v. Hertwig*, 398 F.2d 452 (5th Cir. 1968); *see also Dennis v. Commissioner*, 473 F.2d 274 (5th Cir. 1973). In *Hertwig*, on the day that the corporation was formed, the promoters transferred $10,-

ating substantial rental income, was transferred in consideration for an unsecured promise to pay $125,000 in semi-annual installments over a period of years. In spite of the fact that the corporation had only nominal capitalization, the transaction was treated as a sale. The *Piedmont* court stated:

> "Admittedly, in the case at bar the success of the venture was not as sure as the venture in the *Sun Properties* case, because, in the *Sun Properties* case, the ability of the warehouse to produce revenue had been demonstrated, and the warehouse was under lease when the transfer was made. But in the instant case, the risk of the noteholders was far less than the noteholders in *Burr Oaks* and *Aqualane*." [388 F.2d at 891.]

**23.** 25 T.C.M. (CCH) 1344 (1966).

**24.** These facts were that negotiations for purchase by third parties had begun before the corporation obtained title to the land and that the land was adjacent to a shopping center in the course of development.

**25.** The facts in the instant case which indicated "some degree of certainty to the financial success of the venture" were that there was a reasonable expectation of profit to the corporation over and above its costs, that the property was reasonably anticipated to be readily marketable at its development and that the opportunity for sale to third parties had existed at the time of the decision to make the sale to the corporation.

**26.** Inasmuch as Thomas was, at all times relevant herein, the sole shareholder of Castlewood, the control requirement, as defined in section 368(c), was satisfied. While on brief defendant also maintained that the Castlewood notes could be considered "stock" within the meaning of section 351, our determination that the notes did not constitute an equity investment in the corporation precludes this possibility.

000 cash in exchange for stock, and patents worth $3,000,000 in exchange for unsecured promissory notes. The patents were the primary assets of the corporation. The notes were not subordinated and the promoters did not waive any of their rights to enforce the terms of the notes. It was stipulated that the price of $3,000,000 was reasonable and that the parties had a reasonable expectation that the notes would be paid. From this evidence, the Fifth Circuit held that the notes were "securities" within the meaning of the statute, since the promoters had retained a continuing proprietary interest in the success of the venture. 398 F.2d at 455.

Notwithstanding these factual similarities with the present case, we are not moved to characterize the Castlewood notes as section 351 "securities." To us, the critical distinction in *Hertwig* is that upon receiving the patents, the corporation therein then licensed two companies controlled by the transferor-promoters to use the inventions covered by the patents in return for an agreed royalty and also agreed to act as the sales agent for the licensees on a commission basis. In other words, payment of the notes was dependent upon the receipt of royalties and commissions from the licensees. It is readily apparent that the successful exploitation of the patents became necessary to satisfaction of the notes, thereby increasing the risk assumed by the noteholders. The extent of this risk is graphically illustrated by the fact that interest payments on the notes were discontinued only one year after issuance and further by the fact that the actual principal payments made to the noteholders fell far short of the amounts required to be paid, due largely to the inability of the licensees to pay the royalties and commissions owed to the corporation. 398 F.2d at 453–54. Clearly, these transferor-noteholders had a continuing proprietary stake in the business, for their ultimate payment was utterly contingent upon the profitable use of the patents.[27]

■ We have already given our reasons as to why the Castlewood notes did not constitute a continuing proprietary interest in Castlewood and we will not repeat them here. It is sufficient to say that the degree of risk represented by these notes was insubstantial in comparison to that existing in *Hertwig*. Our evaluation of the Castlewood notes convinces us that they were not "securities" within section 351.[28]

### III

■ The second question presented is whether the receipt by SJL of the proceeds from payment of the Castlewood notes constituted passive investment income within the meaning of section 1372(e)(5) in excess of 20 percent of its gross receipts, so as to cause the termination of its subchapter S status. If so, defendant maintains, then the plaintiffs who were shareholders of SJL would be deemed to have received dividend distributions, reportable as ordinary income, to the extent of the corporation's earnings and profits, rather than distributions of capital gain and ordinary interest income, as actually reported. According to defendant, their taxable income would then be generally as shown on the notices of defi-

---

27. Moreover, it is obvious that the patents were assigned to the intermediate corporation before being transferred to the licensees solely in an attempt to convert the amounts to be received through exploitation of the patents from ordinary income to capital gain. *See Dennis v. Commissioner*, 473 F.2d 274, 278, 281 85 (5th Cir. 1973). Such a motive further distinguishes *Hertwig* from the present case.

28. Although classification of notes as "securities" depends upon an "overall evaluation of the nature of the debt," the length of time to maturity usually is regarded as the most important single earmark. Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* § 3.04 at 3–16 (4th ed. 1979). A note payable in full within 5 years would almost certainly not be considered a security, while one maturing in 10 years or more is almost certainly of sufficient dignity to constitute a security. Plumb, *The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal*, 26 Tax L.Rev. 369, 562–63 (1971). The terms of the Castlewood notes, with maturity dates ranging from two and one-half to six and one-half years, do not suggest that they were securities.

ciency issued with respect to each of them. In rebuttal, plaintiffs contend that such proceeds did not constitute passive investment income and that their taxable income for the years in issue should be generally as shown on their returns as filed, since SJL's subchapter S status would be preserved.

Under section 1372(e)(5)(A), corporations which qualify under subchapter S will lose that status if, for any taxable year, the corporation has gross receipts more than 20 percent of which are passive investment income.[29] The term "passive investment income" is defined to mean "gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities * * *." Section 1372(e)(5)(C).

As stipulated by the parties, SJL's only receipts were the payments by Castlewood on the notes. It is undisputed that the portion of the proceeds received by SJL in payment of the Castlewood notes which comprised the payment of interest was passive investment income under the statute. However, plaintiffs point out that only this amount of passive investment income did not violate the 20 percent of gross receipts

limitation. Thus, the question centers on the proper treatment of SJL's receipt of the principal payments on the Castlewood notes.

Defendant bases its position on the argument that the principal payments on the Castlewood notes constituted receipts from the sale or exchange of stock or securities within the meaning of the statute.[30] This raises two issues: whether satisfaction of the notes constituted a "sale or exchange" and whether the notes were "stock or securities."

The latter question is easily answered. The pertinent subchapter S regulations direct reference to the personal holding company regulations for the meaning of the term "stock or securities" as used in section 1372(e)(5). Treas.Reg. § 1.1372–4(b)(5)(x), T.D. 6960, 1968–2 C.B. 342. As defined in Treas..Reg. § 1.543–1(b)(5)(i) (1960), "stock or securities" includes—

> shares or certificates of stock, stock rights or warrants, or interest in any corporation * * *, certificates of interest or participation in any profit-sharing agreement, or in any oil, gas, or other mineral property, or lease, collateral trust

**29.** Subchapter S was enacted into the Internal Revenue Code in 1958. Pub.L. No. 85 866, § 64, 72 Stat. 1606, 1650 (1958). The stated purpose of the provisions was to permit small businesses to select a form of business enterprise without having to consider major differences in federal tax consequences. S.Rep.No. 1983, 85th Cong., 2d Sess. 87 (1958), *reprinted in* [1958] U.S.Code Cong. & Ad.News 4791, 4876. Because no hearings were held on the bill, the rationale for including the passive investment income limitation, and specifically the six individual items of income constituting that category, is not entirely clear. Subsequently, Congress indicated that the passive investment income limitation was designed to "limit the availability of this [subchapter S] treatment to small businesses actively engaged in trades or businesses." S.Rep.No.1007, 89th Cong., 2d Sess. 8 (1966), *reprinted in* [1966] U.S.Code Cong. & Ad.News 2141, 2148; H.R.Rep.No. 1238, 89th Cong., 2d Sess. 8 (1966).

The legislative history of the subchapter S provisions strongly suggests that the prevention of funding of qualified pension and profit-sharing plans with income from incorporated investments might have been the primary aim of the passive investment income restrictions. *See Zychinski v. Commissioner,* 506 F.2d 637,

639 n.9 (8th Cir. 1974), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2397, 44 L.Ed.2d 666 (1975); Staff of the Joint Comm. on Taxation, 96th Cong., 2d Sess., Staff Recommendations for Simplification of Tax Rules Relating to Subchapter S Corporations 11 (Joint Comm. Print 1980); Hewitt, *Some Intriguing Recent Developments in Subchapter S,* 44 Taxes 848, 858–59 (1966).

**30.** On brief, defendant raised two additional arguments. First, defendant contended that if the Castlewood notes were "stock or securities" within the meaning of section 351, then the gross receipts of SJL, representing either dividends or gain from the sale or exchange of securities, would all be passive investment income within the meaning of section 1372(e)(5). Secondly, defendant argued that if section 351(a) applied, but the Castlewood notes were found to be "other property" within the meaning of section 351(b), then the gross receipts of SJL would consist entirely of the interest paid on the notes, which again would all be passive investment income within the meaning of the statute. In view of our conclusion in part II of this opinion that section 351 does not apply to the subject transaction, we do not reach these arguments.

certificates, voting trust certificates, bonds, debentures, *certificates of indebtedness, notes*, car trust certificates, bills of exchange, obligations issued by or on behalf of a State, Territory, or political subdivision thereof. (Emphasis added.)

We have no difficulty finding that the Castlewood notes are encompassed within the term "stock or securities" by virtue of their characterization as either "certificates of indebtedness" or "notes" within the meaning of the regulation.

■ However, we are not convinced that the requisite "sale or exchange" of these stock or securities has been established. It cannot be denied that *no actual sale or exchange* of the Castlewood notes occurred.[31] Therefore, in order to satisfy the definitional requirement, defendant relies on section 1232(a)(1), which generally provides that amounts received on the retirement of bonds or other evidences of indebtedness which are capital assets in the hands of the holder shall be considered as amounts received in "exchange" therefor.[32] It is well established that absent the direct application of section 1232, the mere satisfaction of a note does not constitute a "sale or exchange" of that note. *Riddell v. Scales*, 406 F.2d 210, 212 (9th Cir. 1969). Upon close examination of the scope and purpose of section 1232(a)(1), we find that such an "exchange" cannot be imputed under the facts herein.

We are drawn to this conclusion for two reasons. First, we recognize that section 1232 is not intended to cover all corporate contractual obligations to pay money. *See, e.g., Wilson v. Commissioner*, 51 T.C. 723, 729 (1969). As recounted by the Tax Court in *Estate of Stahl v. Commissioner*, 52 T.C. 591 (1969), *aff'd*, 442 F.2d 324 (7th Cir.

1971), certain corporate obligations are beyond the statute's purview:

> Section 117(f) of the Internal Revenue Code of 1939, the predecessor to section 1232, was limited in its scope to awarding capital gain treatment to the proceeds from the retirement of bonds or other evidences of indebtedness which were issued in registered form or with coupons attached. On the occasion of reenacting section 117(f) into the 1954 Code as section 1232, amendments were made and the reach of the provision lengthened. However, a review of the legislative history of such amendments fails to reveal any intent on the part of Congress to include within the expanded scope payments made in satisfaction of notes issued as evidence of an obligation to pay a prescribed purchase price. Such notes obviously have no independent significance other than as evidence of an agreed purchase price for property sold. [52 T.C. at 598.]

Similarly, we find that the Castlewood notes lack any independent significance other than as evidence of Castlewood's unconditional promise to pay a fixed purchase price for the subdivision property.

In response to *Estate of Stahl*, defendant asserts that the Castlewood notes did have independent significance to SJL since they comprised the corporation's sole capitalization. However, we feel that this argument misses the point of the distinction drawn by the Tax Court. As we read *Stahl*, "independent significance" connotes that the notes embody some notion of a separate and continuing commercial vitality related to the corporate business, apart from their character as evidence of an indebtedness. This is an essential characteristic of bonds and debentures, the two primary corporate

---

**31.** There was no bilateral transfer between Castlewood and SJL. The transactions which occurred were: (1) the sale, a transfer of the subdivision from Thomas to Castlewood and a transfer of the notes from Castlewood to Thomas; (2) the tax-free organization of SJL, a transfer of the notes from Thomas to SJL and a transfer of stock from SJL to Thomas; and (3) payment of the notes, the payment of cash by Castlewood to SJL, with nothing passing from SJL to Castlewood. The only actual "exchange" was of the subdivision for the notes.

**32.** Section 1372(e)(5) has been held to apply to deemed "sales or exchanges" as well as to actual sales or exchanges. *Lansing Broadcasting Co. v. Commissioner*, 52 T.C. 299, 304 (1969), *aff'd*, 427 F.2d 1014 (6th Cir.), *cert. denied*, 400 U.S. 941, 91 S.Ct. 238, 27 L.Ed.2d 244 (1970).

contractual obligations covered by section 1232(a)(1). While the language employed by the statute mentions more than just these two types of obligations, we find no reason to believe that the basic character of these additional kinds of corporate indebtedness must not be of the same class or similar to bonds and debentures.

The legislative history of section 1232(a)(1) demonstrates this much. Under the predecessors to section 1222, capital gain treatment was conferred upon gains from the "sale or exchange" of capital assets. *See, e.g.,* Revenue Act of 1921, ch. 136, § 206(a)(1), 42 Stat. 227, 232. Section 117(f), the predecessor to section 1232(a)(1), was enacted as part of the Revenue Act of 1934, ch. 277, 48 Stat. 680, 715, to resolve conflicting judicial decisions as to whether a retirement of bonds constituted a "sale or exchange" for purposes of meeting this requirement for capital gain treatment. Under prior law, it had been held that the term "sale or exchange" in the various revenue acts did not include such a retirement, gain being treated as ordinary income and any resulting loss as a bad debt. *See Fairbanks v. United States,* 306 U.S. 436, 437, 59 S.Ct. 607, 608, 83 L.Ed. 855 (1939). This caused taxpayers to seek capital gain treatment through the sale of the bonds before the actual date of maturity, thereby creating anomalous results in the characterization of income realized from bonds sold by the holder just before retirement and bonds held until maturity. Section 117(f) alleviated this problem by providing the "sale or exchange" necessary for capital gain treatment upon the redemption or retirement of "bonds and *similar securities* in registered or coupon form." Hearings before House Committee on Ways and Means on General

Revision of the Internal Revenue Code, 83d Cong., 1st Sess., Part 2, 1081 (1953). (Emphasis added.)

This provision was substantially reenacted by the Revenue Act of 1939, ch. 1, § 117(f), 53 Stat. 1, 52. Section 1232(a)(1), as enacted in the Internal Revenue Code of 1954, ch. 1, 68A Stat. 3, 326, restated the content of existing law, while expanding its coverage to noncouponed, nonregistered bonds and other evidences of indebtedness. H.R.Rep.No.1337, 83d Cong., 2d Sess. A275 (1954), *reprinted in* [1954] U.S.Code Cong. & Ad.News 4025, 4417; S.Rep.No.1622, 83d Cong., 2d Sess. 433 (1954), *reprinted in* [1954] U.S.Code Cong. & Ad.News 4629, 5076. Like the Tax Court in *Estate of Stahl,* we have considered the pertinent legislative history and the explanations provided therein and find that the changes in the statute under the 1954 Code do not indicate any intention by Congress to expand the provision's coverage to include obligations which were not fundamentally like bonds or debentures.[33]

As we have found in part II of this opinion, the Castlewood notes did not represent a continuing proprietary interest in Castlewood.[34] The unavailability to Thomas, as holder of the notes, of anything derived from the corporate venture itself left the notes as representing nothing beyond the right to payment of the purchase price for the subdivision property. The transfer of the notes to SJL did not alter this fact, nor did it inject the notes with any readily marketable commercial value. The essential nature of the Castlewood notes, even in the hands of SJL, was still that of evidence of an obligation to pay a fixed purchase price to the holder.

**33.** Hearings before House Committee on Ways and Means on General Revision of the Internal Revenue Code, 83d Cong., 1st Sess., Part 2, 1081 (1953); Hearings before Senate Committee on Finance on H.R. 8300, 83d Cong., 2d Sess., Parts 1, 67 (1954); S.Rep.No.1622, 83d Cong., 2d Sess. 433 (1954), *reprinted in* [1954] U.S.Code Cong. & Ad.News 4629, 5076.

**34.** Thus, the present case is distinguishable from *Dennis v. Commissioner,* 473 F.2d 274 (5th Cir. 1973), wherein a taxpayer sought to avoid the application of section 1232 by arguing that a promissory note received upon the transfer of patents and patent applications to a controlled corporation had no independent significance, citing *Estate of Stahl.* In determining that the note was of the types of indebtedness encompassed by section 1232, the Fifth Circuit found that the note was a "security" within the meaning of section 351, representing a continuing proprietary interest in the success of the corporate business.

In reaching our decision, we are also influenced by the underlying purpose of section 1232(a)(1). As is apparent from the preceding discussion, section 1232(a)(1) is only a characterization provision, intended to provide one of several requirements necessary in order to confer capital gain status on a redemption or retirement of bonds or other evidences of indebtedness. H.R.Rep. No.1337, 83d Cong., 2d Sess. A276 (1954), *reprinted in* [1954] U.S.Code Cong. & Ad. News 4025, 4417–18; S.Rep.No.1622, 83d Cong., 2d Sess. 434 (1954), *reprinted in* [1954] U.S.Code Cong. & Ad.News 4629, 5077.

We find it significant that defendant is not attempting to apply section 1232(a)(1) to the facts herein to either require or deny capital gain treatment to the proceeds received from payment of the Castlewood notes. In fact, defendant freely admits that this is not a case where plaintiffs are trying to convert ordinary income into capital gain. Regardless of the applicability of section 1232(a)(1), SJL is entitled to characterize the proceeds from payment of the notes as capital gain because (1) the character of the gain upon satisfaction of installment notes is the same as that of the underlying property sold, Treas.Reg. § 1.453–9(a) (1960); [35] (2) the notes were acquired by SJL in a transfer under section 351, Treas.Reg. § 1.453–9(c)(2) (1960); [36] and (3) amounts received from notes so acquired are considered to have the same character they would have had in the hands of the transferor, Treas.Reg. § 1.453–9(c)(3) (1960).[37] Thus, since satisfaction of the Castlewood notes would have been long-term capital gain from the sale of real property, a capital asset, to Thomas, it was also long-term capital gain to SJL.

Defendant seeks only to apply section 1232(a)(1) for purposes of creating an "exchange" in order to fit one of the definitions of passive investment income prescribed by section 1372(e)(5)(C). Such efforts are inconsistent with the purpose of section 1232(a)(1) [38] and amount to an improper application of the statute.

Finally, defendant questions whether SJL is entitled to avail itself of the subchapter S provisions given its generally passive behavior. Defendant points out that SJL never invested in or acquired real estate or options for real estate, nor did it engage in or consummate any business transactions. As defendant further notes, all SJL did was obtain the notes from Thomas, collect amounts paid on those notes and make distributions to its shareholders. Thus, according to defendant, since SJL conducted no active trade or business, all of its receipts were entirely passive, for it was not the kind of entity that Congress envisioned

**35.** Treas.Reg. § 1.453-9(a) provides:

"Subject to the exceptions contained in section 453(d)(4) and paragraph (c) of this section, the entire amount of gain or loss resulting from any disposition or satisfaction of installment obligations, computed in accordance with section 453(d), is recognized in the taxable year of such disposition or satisfaction and shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received by the taxpayer."

**36.** Treas.Reg. § 1.453–9(c)(2) provides:

"Where the Code provides for exceptions to the recognition of gain or loss in the case of certain dispositions, no gain or loss shall result under section 453(d) in the case of a disposition of an installment obligation. Such exceptions include: Certain transfers to corporations under section 351 and 361; contributions of property to a partnership by a partner under section 721; and distributions by a partnership to a partner under section 731 (except as provided by section 736 and section 751)."

**37.** Treas.Reg. § 1.453–9(c)(3) provides:

"Any amount received by a person in payment or settlement of an installment obligation acquired in a transaction described in subparagraphs (1) or (2) of this paragraph (other than an amount received by a stockholder with respect to an installment obligation distributed to him pursuant to section 337) shall be considered to have the character it would have had in the hands of the person from whom such installment obligation was acquired."

**38.** We feel that part of defendant's problem stems from a misconception of the facts herein. The amounts received by SJL were not payments related to satisfaction of the notes themselves, but rather were payments in satisfaction of the purchase price of the real property sold.

when it enacted the subchapter S provisions.

However, we reject the conclusion reached by this line of inquiry, for defendant seeks to have us "define colloquially a term which is already defined statutorily. *Zychinski v. Commissioner*, 506 F.2d 637, 638 (8th Cir. 1974), *cert. denied*, 421 U.S. 999, 95 S.Ct. 2397, 44 L.Ed.2d 666 (1975). It has been consistently held that the statutory definition of passive investment income is to be strictly interpreted and section 1372(e)(5) to be applied literally, without regard to whether the corporation's business is either active or passive. *See Zychinski; Buhler Mortgage Co. v Commissioner*, 51 T.C. 971 (1969), *aff'd*, 443 F.2d 1362 (9th Cir. 1971).

In *Buhler Mortgage*, promissory notes secured by deeds of trust were held to be "securities" within section 1372(e)(5), although the taxpayer therein had argued that since it expended a great deal of effort and engaged in many activities in order to produce the notes, the proceeds therefrom were not of the passive nature envisioned by the statute. The Tax Court disagreed, stating:

> Though we agree * * * that the subchapter S provisions were not intended to include corporations with large amounts of investment-type income * * * we cannot find that the nature of the income changes simply because the corporation earning it must engage in many activities and exert a great deal of effort in doing so. The standard used by the Code and the regulations does not permit us to look behind the normal characterizations of a corporation's receipts in order to classify them as active or passive. [51 T.C. at 977.]

Similarly, in *Zychinski*, section 1372(e)(5) was applied to a corporation actively engaged in the securities business. Finding that section 1372(e)(5) did not differentiate between trade or business activity and non-business activity, the Eighth Circuit affirmed the decision of the Tax Court,[39] citing *Buhler Mortgage.* 506 F.2d at 638.

The fact that certain gain might have resulted from the active engagement of the corporation in a business yielding the type of gain involved was determined to be irrelevant.

The announced test of these cases requires that a court look only to the plain meaning of the words used to define the income, not to the activity required to produce it. *Zychinski v. Commissioner*, 506 F.2d at 638–39; *Buhler Mortgage Co. v. Commissioner*, 51 T.C. at 978. *See also Marshall v. Commissioner*, 60 T.C. 242, 251 (1973), *aff'd*, 510 F.2d 259, 263–64 (10th Cir. 1975).

■ This approach is further confirmed by the Commissioner's own ruling. In Rev. Rul. 75–188, 1975–1 C.B. 276, a corporation that was merely a passive investor receiving capital gain from its sale of unimproved real property was held not to lose its subchapter S status because the gains derived from the sale were not within any of the terms set forth in section 1372(e)(5) defining passive investment income. Moreover, the Commissioner clearly stated that "activity" or "passivity" was not the issue where the characterization of income as passive investment income was in question:

> In S.Rep.No.1007, 89th Cong., 2d Sess. (1966), it is stated that in accordance with Congress' decision to limit the subchapter S election to active businesses, present law * * * provides that a "pass-through" election is terminated automatically where more than 20 percent of a corporation's gross receipts are derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities.

The emphasis in the above statement on the "automatic" nature of the passive investment income test indicates that it was intended as the sole test by which nonactive corporations were to be precluded from the subchapter S election. Accordingly, the fact that the corporation did not operate an active business, but was

---

**39.** 60 T.C. 950 (1973).

merely a passive investor realizing only capital gain from its sale of real property did not result in the termination of its election under subchapter S. 1975–1 C.B. 276, 277.[40]

Thus, it is clear that income received from a source not proscribed by section 1372(e)(5) does not result in termination of subchapter S status, regardless of the level of activity of the corporation. We have already found that the proceeds received from the payment of the Castlewood notes did not fall within the definition of "passive investment income." SJL's level of business activity cannot alter this finding. Consequently, defendant's position must fail.

## CONCLUSION

Upon consideration of the briefs and oral argument and for the foregoing reasons, we hold that plaintiffs are entitled to recover and judgment is entered to that effect with the amount of recovery to be determined pursuant to Rule 131(c).

---

**40.** Rev.Rul. 75-188 also followed *Howell v. Commissioner*, 57 T.C. 546 (1972), *acq.* 1974–1 C.B. 2. In *Howell*, a corporation whose sole activity was to hold real property for resale qualified for subchapter S treatment because receipts derived from the sale or exchange of the real property were not proscribed by section 1372(e)(5) or the regulations, regardless of the level of activity of the corporation. 57 T.C. at 556. *See also Buono v. Commissioner*, 74 T.C. 187 (1980), where the Tax Court found "nothing unique or improper" about a subchapter S corporation being formed to acquire undeveloped real property, which it later sold as a single tract without engaging in any further activity. 74 T.C. at 196–97.