The **PIEDMONT CORPORATION,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

No. 11311.

United States Court of Appeals
Fourth Circuit.

Argued June 22, 1967.

Decided Jan. 4, 1968.

Claude C. Pierce, Greensboro, N. C. (Charles B. Robson, Jr., and McLendon, Brim, Brooks, Pierce & Daniels, Greensboro, N. C., on brief) for petitioner.

Donald Williamson, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Robert N. Anderson, Attys., Dept. of Justice, on brief) for respondent.

Before SOBELOFF, BOREMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The essential question we must decide is whether the assignment to the taxpayer of certain option rights held by its sole. stockholders in return for $10,000 cash and $160,000 in unsecured promissory notes constituted a *bona fide* sale or a contribution to capital.[1] The Tax Court concluded that the successive transfers of the option were in effect a contribution of capital and that the promissory

---

1. The case arose when the Commissioner determined deficiencies in the taxpayer's income taxes for its fiscal years ended April 30, 1960, April 30, 1961 and April 30, 1962, in the respective amounts of $22,993.73, $1,257.91 and $7,031.29. In most part the deficiencies arose from the disallowance of interest paid on the notes as an interest deduction and adjustments to the taxpayer's cost basis of lots subsequently sold to conform that basis to the Commissioner's view of the initial transactions.

notes must be regarded as evidencing an equity investment, with the interest paid thereon regarded as a non-deductible dividend on preferred stock. The Piedmont Corporation, ¶ 66.263 P.H.Memo T.C. Finding no evidentiary basis on which to conclude that the transaction should be treated other than a sale, we reverse.

The taxpayer was organized October 13, 1949 but remained dormant with nominal assets until November 14, 1957. Oscar W. Burnett ("Burnett"), initially, was the sole stockholder, holding one share of the taxpayer's capital stock of a par value of $10 per share, which Burnett had purchased for $10.

In March, 1953, Edward Loewenstein ("Loewenstein") informed Burnett that his mother-in-law was interested in selling her residence and adjoining land, consisting of approximately 11 acres (the "Cone property"). At Loewenstein's suggestion, Bessemer Improvement Company ("Bessemer"), a corporation engaged in the business of developing property in the vicinity of the Cone property, entirely owned by Burnett and his wife, acquired title to the Cone property. In September, 1953, Bessemer gave Loewenstein and Burnett a 10-year option with a right of renewal for an additional 10 years, to purchase the Cone property for the sum of $67,000. The Cone property was divided into four separate tracts, and the purchase price for each, assuming that Bessemer did not exercise its right to develop the property, make improvements and erect buildings thereon, was fixed at $30,930 for Tract No. 1, $10,300 for Tract No. 3 and $25,770 for Tracts Nos. 2 and 4, combined.

Burnett and Loewenstein held their option on the Cone property until the fall of 1957, at which time a very substantial area adjacent to the Cone property was acquired for the construction of a shopping center, which opened in 1959. On November 14, 1957, when Burnett and Loewenstein acquired all of taxpayer's outstanding capital stock,[2] negotiations on behalf of the taxpayer were in progress concerning the sale of a lot from the Cone property to a substantial purchaser for the price of $30,000.

Contemporaneously with Burnett's and Loewenstein's acquiring all of taxpayer's stock, taxpayer embarked on a program of acquiring the option held by Burnett and Loewenstein in three successive transactions, paying for the portion of the option acquired each time by its unsecured promissory notes, exercising the option and then selling lots from the land it acquired to outside purchasers. Overall, the program was singularly financially successful. The details of the various transactions follow:

In the first transaction, taxpayer, through the action of its directors, was authorized to acquire the portion of the option held by Burnett and Loewenstein to acquire Tracts Nos. 2, 3 and 4 of the Cone property for $60,000, to be paid by two unsecured notes for $30,000, one payable to Burnett and one payable to Loewenstein. By their terms, the notes were each payable in $5,000 annual installments on November 22, 1958 to November 22, 1963, inclusive, with per annum interest at 5%. Taxpayer was also authorized to exercise the option rights with Bessemer and acquire title to Tracts Nos. 2, 3 and 4 for a total price of $38,424.18. It was estimated at the time that it would cost taxpayer at least $24,265 to develop the three tracts, by putting in a street, with sewers, curbs and gutters.

Taxpayer immediately exercised the option to purchase Tracts Nos. 2, 3 and 4 and settlement therefor was held November 22, 1957. Taxpayer gave Bessemer an unsecured promissory note for $11,070 and assumed the obligation of a deed of trust, previously created, on the

2. On November 14, 1957, Burnett purchased two more shares of taxpayer's capital stock, paying therefor $20; Loewenstein acquired the remaining three shares for $30. *Taxpayer's paid-in capital was* *thus $60, and remained such at all times pertinent to this case.* Upon Loewenstein's becoming a stockholder of the taxpayer, he was elected vice president; Burnett was president.

property conveyed. Within a month after taxpayer exercised this portion of the option, it sold to third persons two lots, one for $30,000 cash (the one for which negotiations had been previously conducted) and another for $2,500 in cash, and another parcel of land bordering on the Cone property. At the end of the calendar year 1957, taxpayer had sold thus two lots for $32,500 and owned land estimated to be worth $100,000.

On March 3, 1958, taxpayer was authorized to acquire, and did acquire, a portion of the option held by Burnett and Loewenstein covering Tract No. 1 for $70,000, to be paid for by two unsecured notes each for $35,000, one payable to Burnett and one to Loewenstein. The notes were each payable in $5,000 annual installments on March 3, 1959 to March 3, 1965, inclusive, with per annum interest at 5%. Taxpayer, contemporaneously, was authorized to exercise the option rights and pay Bessemer $20,000 for this portion of the land. The option was exercised and settlement with Bessemer held March 10, 1959, with taxpayer giving Bessemer its unsecured note for $20,000.

After the exercise of this portion of the option, and before it acquired the remaining portion of the option for Tract No. 1, taxpayer made numerous sales of lots of the land it had acquired. One was sold for $37,500, another for $50,000 and, ultimately, four more were sold for $56,000, $70,500, $11,250 and $7,500, respectively, without exhausting all of the land which taxpayer thus acquired.[3]

A third transaction occurred on March 16, 1960, when Burnett and Loewenstein assigned to taxpayer their option covering the remaining portion of Tract No. 1, in return for a cash payment of $5,000 to each, and petitioner's unsecured 5% promissory note in the principal amount of $15,000 to each. The principal payments on the notes were due March 16, 1961 to March 16, 1963, inclusive. Taxpayer immediately exercised the option to purchase this portion of Tract No. 1, and settlement with Bessemer was held March 16, 1960.[4]

It is undisputed that the consideration given by taxpayer to Burnett and Loewenstein for each portion of the option it received was equivalent to, or less than, the fair market value of that portion. During the taxable years ended April 30, 1958 through April 30, 1964, taxpayer paid to Burnett and Loewenstein interest in the total sum of $26,633.56. Taxpayer also made current payments on account of principal on each of the three sets of notes, until the time that the Commissioner questioned the *bona fides* of the purported sales. At no time has taxpayer declared or paid formal dividends to its stockholders, nor has it paid salaries to its officers.

As the Tax Court observed, the essential question we must decide arises because of § 351 of the Internal Revenue Code, 26 U.S.C.A. § 351.[5] Our problem

---

3. As of April 30, 1958, the end of its first fiscal year of active operations, taxpayer had an earned surplus of $2,597.25 and it carried its unsold land at a value of $99,187.43. The conservativeness of this valuation is manifest from the prices it obtained in subsequent sales without exhausting its supply of unsold land. At the close of its second year of active operations, taxpayer had earned surplus of $11,699.31 and unsold land valued at $70,406.02.

4. By the close of fiscal 1960, taxpayer had earned surplus of $29,408.75 and unsold land valued at $78,563.10.

5. § 351. Transfer to corporation controlled by transferor

"(a) General rule.—No gain or loss shall be recognized if property is transferred to a corporation (including, in the case of transfers made on or before June 30, 1967, an investment company) by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

"(b) Receipt of property.—If subsection (a) would apply to an exchange but

is whether the successive transfers of the option were *bona fide* sales, paid for by promissory notes, or whether Burnett and Loewenstein transferred their option rights to taxpayer at the risk of taxpayer's business as a contribution to capital. The Tax Court correctly noted that the essential nature of the transaction [6] is to be determined from a consideration of all of the surrounding circumstances.[7]

As factors indicating that the transactions were sales, the Tax Court, correctly we think, pointed out that the notes were unconditional promises to pay, with fixed and not unreasonably prolonged maturity dates, that they bore reasonable interest and that they conferred no voting rights on the holders. Moreover, the notes were not subordinated to the debts due other creditors and until the *bona fides* of the transactions were questioned, the interest and installments of principal were paid when due. An additional factor establishing the validity of the transactions as sales was the reasonableness of the price paid for assignments of portions of the option when compared to their actual value, because any evidence that the value was inflated would support the inference that the notes were pretextuous devices to channel income to Burnett and Loewenstein taxable solely as capital gains.

The Tax Court did find significant the fact that Burnett and Loewenstein received notes in equal principal amounts, since they each owned an equal amount of taxpayer's capital stock. It noticed this fact as "consistent with a conclusion that the notes represent an equity interest in the corporation." While a disproportion between stock ownership and note ownership is evidence of bona fide indebtedness since the advance made by a stockholder in greater proportion than his stock may be treated as some evidence of what an outside lender would advance, Charles E. Curry, 43 T.C. 667 (1965), the converse is not necessarily true. While a proportionate relationship between stock and ownership may be "consistent" with the conclusion that the notes represented an equity contribution, such a relationship, standing alone, does not constitute evidence of that conclusion. Indeed, it begs the question. In this case Burnett and Loewenstein were joint owners of the option granted them by Bessemer; their interests in the option were equal. Payment to them for transfers of portions of their option should have been in equal amounts. It would be unrealistic to require that in order to avoid adverse tax consequences the parties contrive a scheme whereby payment was received other than equally.

The Tax Court also concluded that since Burnett and Loewenstein had iden-

---

for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

"(c) Special rule.—In determining control, for purposes of this section, the fact that any corporate transferor distributes part or all of the stock which it receives in the exchange to its shareholders shall not be taken into account."

6. Incorrectly, we think, the Tax Court treated certain statements of taxpayer's

counsel as agreeing that the Tax Court need decide the tax consequences of only the first transfer of a portion of the option and its decision would thus be dispositive of the other two. In our view of the case, counsel made no such agreement. The point is academic, however, because we view each of the three transfers as a sale.

7. Several authorities have undertaken to list the factors generally considered relevant to a determination of whether a transfer is a sale or a contribution to capital: Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), aff'd., Kolkey v. C. I. R., 254 F.2d 51 (7 Cir. 1958); Rowan v. United States, 219 F.2d 51 (5 Cir. 1955); Burr Oaks Corp., 43 T.C. 635 (1965), aff'd., Burr Oaks Corporation v. C. I. R., 365 F.2d 24 (7 Cir. 1966).

tical interests in the notes and in taxpayer's capital stock, it was reasonable to infer that if taxpayer had not been financially successful, the notes would have been subordinated to the taxpayer's debts to other creditors. Our review of the record discloses no evidentiary basis from which this inference can properly be drawn. Mere equality of position as creditors and owners of capital stock gives no basis for determining what might have happened if taxpayer had gone bankrupt. In that event, Burnett and Loewenstein, as creditors, could share in *pari passu* with other unsecured creditors; their ownership of equity would provide no compulsion, or indeed, incentive to subordinate their claims.

As the Tax Court ultimately recognized, the only substantial factor supporting a determination that the transfers were not sales is the factor of taxpayer's undercapitalization, at the time of the first transfer of a portion of the option. The Tax Court rested its conclusion on Burr Oaks Corporation v. C. I. R., 365 F.2d 24 (7 Cir. 1966), and Aqualane Shores, Inc. v. C. I. R., 269 F.2d 116 (5 Cir. 1959), both of which upheld the treatment of a purported sale as a contribution to capital. The Tax Court distinguished the instant case from Sun Properties v. United States, 220 F.2d 171 (5 Cir. 1955), in which, notwithstanding a "thin" capitalization, the transfer of an income-producing warehouse in exchange for an unsecured promise to pay was deemed a sale and not a contribution to capital. Our analysis of these decisions leads us to conclude that *Burr Oaks* and *Aqualane* are clearly distinguishable from the instant case, and that we should follow the *Sun Properties* decision. Stated otherwise, we can find no basis to ignore the form of the transaction into which the parties cast their dealings. In arriving at this result, we are mindful that each case must be decided on its own facts.

In *Burr Oaks* the controlling officers of a corporation had purchased a tract of undeveloped land for $100,000, which they initially planned to develop into a regional shopping center or an industrial park. When the original plan proved not feasible, Burr Oaks Corporation was formed and the land was transferred to it, subject to a mortgage of $30,000, in exchange for three two-year 6% promissory notes, in the principal amount of $110,000 each. Burr Oaks Corporation intended to subdivide the land, improve it, and sell lots.

There was no evidence that any negotiations for the purchase of any lots had been carried on prior to, or contemporaneously with, the transfer, and there was no real basis for concluding that the project would be successful or that the land could be sold. Improvement costs were extremely high and, as found by the Tax Court, the price which Burr Oaks was caused to pay for the land was at least twice its value. Thus, the noteholders attempted to gain for themselves profits, taxable only as capital gains, far in excess of the value of the land which they sold. When the notes matured they were only partially paid and new one-year promissory notes, each in the principal amount of $87,000, were given. Before these notes matured, additional payment was made to each of the three noteholders and new notes, in the principal amount of $79,000 each, were issued. Without the knowledge of the stockholders or formal authorization by the directors, Burr Oaks transferred lots and parcels to the three noteholders at no cost, or at a cost less than the amount the land would realize from sales to third persons.

By contrast in the instant case, negotiations for the purchase had begun before taxpayer acquired title to any land, thus giving some degree of certainty to the financial success of the venture. The land was known to be adjacent to a shopping center in the course of development, an additional factor supporting anticipated financial success of the venture. A fair purchase price was paid for the successive transfers of a portion of the option and for the land; hence, taxpayer could gain from the venture and not have all of its gain diverted to Burnett and

Loewenstein. Taxpayer gave notes which bore reasonable interest and had a reasonable maturity, and it paid the interest and installments of principal when due, promptly and regularly. Taxpayer did not retransfer any portion of any option, or any land which it acquired by exercise of an option, to Burnett or Loewenstein. Burnett and Loewenstein were never asked to renew notes or to forego payment while other debts were outstanding.

The contrast between the instant case and the *Aqualane* case is even more marked. In *Aqualane,* the land transferred was swamp land, upon which vast improvements, including canals, would be required to make the land suitable for residential subdivision. The success of the enterprise was highly speculative, and Aqualane was compelled at various times to make additional loans to keep current with expenses, and payments on the promissory notes were postponed for four years beyond their maturity. At the time of the transfer, Aqualane had $600 of operating funds; taxpayer almost immediately realized a $30,000 sale. Thus, Aqualane's ability to pay its notes was entirely dependent upon, and at the risk of, the success of the enterprise; at the outset, taxpayer demonstrated its ability to meet its obligations when they matured.

In the *Sun Properties* case, a warehouse building, which was rented, and which produced substantial revenues, was transferred for a consideration of $125,-000, payable at the rate of $4,000 semiannually, without interest. Sun Properties had only nominal equity capital but, notwithstanding the transaction was treated as a sale and not a contribution to capital. The mere fact that Sun Properties was a "thin corporation" was held by the Court not enough, standing alone, to require that the transaction be treated as a contribution of capital, rather than a sale.[8]

Admittedly, in the case at bar the success of the venture was not as sure as the venture in the *Sun Properties* case, because, in the *Sun Properties* case, the ability of the warehouse to produce revenue had been demonstrated, and the warehouse was under lease when the transfer was made.[9] But in the instant case, the risk of the noteholders was far less than the noteholders in *Burr Oaks* or *Aqualane.* We are thus persuaded that *Sun Properties,*[10] rather than the *Burr Oaks* or *Aqualane* cases, is controlling. See also, Murphy Logging Co. v. United States, 378 F.2d 222 (9 Cir. 1967), in which probable success of the future enterprise was considered along with nominal capitalization in determining that a transfer was a *bona fide* sale. We conclude that an evidentiary basis to disregard the purported sales as *bona fide* sales is lacking, and the decision of the Tax Court was in error.

Reversed.

8. On this point the Court was content merely to cite its then recent decision in Rowan v. United States, 219 F.2d 51 (5 Cir. 1955), where the problem of the "thin" corporation was exhaustively treated. There it was held that the fact that a corporation was "thin" was not enough, absent some evidence such as issuance of certificates of stock, subordination to other indebtedness, inordinately postponed due date, agreement that interest be paid only out of earnings, etc., one or more of which the Court said was present in the "usual" case where a purported sale was treated as a contribution to capital.

9. We make this statement primarily with regard to the first transfer of a part of the option to taxpayer. Even if we had doubt about the correctness of treating the notes given therefor as *bona fide* notes (which we do not), the success of the enterprise, as the facts we have stated demonstrate, became more marked with each of the two succeeding transfers.

10. It is significant, also, that *Sun Properties* relied in part on *Rowan,* cited in ftnt. 7. In *Rowan* the business enterprise to which purported loans were made was a failing one. Nevertheless, the validity of the loans, as loans, was recognized.