105 T.C. No. 22


UNITED STATES TAX COURT


NORTHERN INDIANA PUBLIC SERVICE COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24468-91.                    Filed November 6, 1995.


        P, a domestic utility company, formed F as a
subsidiary corporation in the Netherlands Antilles.
F's only activity was to borrow money by issuing
Euronotes and then lend the proceeds to P at an
interest rate that was 1 percent greater than the rate
on the Euronotes.  Sec. 1441, I.R.C., generally
requires a domestic taxpayer to withhold a 30-percent
tax on interest paid to nonresident aliens.  However,
payments to Netherlands Antilles corporations were
exempted from this tax pursuant to treaty.  R
determined that F was a mere conduit or agent of P,
that P should be treated as having paid interest
directly to the Euronote holders, and that P is
therefore liable for the withholding tax.

        <u>Held</u>:  F engaged in the business activity of
borrowing and lending money.  F was not a mere conduit
or agent.  The treaty exemption applies.  P is not
liable for the withholding tax.

Lawrence H. Jacobson, David C. Jensen, and Michael L. Brody, for petitioner.

Elsie Hall, Reid M. Huey, and Monique I.E. van Herksen, for respondent.


RUWE, Judge:  Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|------------|
| 1982 | $3,785,250 |
| 1983 | 3,785,250 |
| 1984 | 3,785,250 |
| 1985 | 3,785,250 |

The sole issue for decision is whether petitioner was required, pursuant to section 1441,[1] to withhold tax on amounts of interest paid to nonresident aliens.  If the answer is yes, petitioner is liable for the tax pursuant to section 1461.[2]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]In Northern Ind. Pub. Serv. Co. v. Commissioner, 101 T.C. 294 (1993), we denied petitioner's motion for partial summary judgment and held that the special 6-year period of limitations contained in sec. 6501(e)(1) applies where the income subject to withholding tax under sec. 1441 is understated by an amount in excess of 25 percent of the amount of gross income stated on Form 1042.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, second, third, and fourth stipulations of facts, and attached exhibits, respectively, are incorporated herein by this reference.

Petitioner is an Indiana corporation with its principal office in Hammond, Indiana. Petitioner's wholly owned foreign subsidiary, Northern Indiana Public Service Finance N.V. (Finance), was incorporated on August 21, 1981, in Curacao under the Commercial Code of the Netherlands Antilles for an unlimited term. Finance had 20 shares of stock issued and outstanding, all of which were acquired by petitioner for $20,000 cash. Finance's sole managing director throughout its existence was Curacao Corporation Company N.V. Finance's books and records were maintained by its managing director in the Netherlands Antilles.

Article 2 of Finance's articles of incorporation provides:

> The purpose of the company is to finance directly or indirectly the activities of the companies belonging to * * * [petitioner] * * *, to obtain the funds required thereto by floating public loans and placing private loans, to invest its equity and borrowed assets in the debt obligations of one or more companies of * * * [petitioner], and in connection therewith and generally to invest its assets in securities, including shares and other certificates of participation and bonds, as well as other claims for interestbearing debts however denominated and in any and all forms, as well as the borrowing and lending of monies.

Specifically, Finance was organized for the purpose of obtaining

funds so that petitioner could construct additions to its utility properties. To accomplish this, Finance was to issue notes in the Eurobond market. The Eurobond market has been aptly described in a 1984 Senate Finance Committee report as follows:

A major capital market outside the United States is the Eurobond market. It is not an organized exchange, but rather a network of underwriters and financial institutions that market bonds issued by private corporations (including but not limited to finance subsidiaries of U.S. companies), foreign governments and government agencies, and other borrowers.

In addition to individuals, purchasers of the bonds include institutions such as banks (frequently purchasing on behalf of investors with custodial accounts managed by the banks), investment companies, insurance companies, and pension funds. There is a liquid and well-capitalized secondary market for the bonds with rules of fair practice enforced by the Association of International Bond Dealers. Although a majority of the bond issues in the Eurobond market are denominated in dollars (whether or not the issuer is a U.S. corporation), bonds issued in the Eurobond market are also frequently denominated in other currencies (even at times when issued by U.S. multinationals). [S. Prt. 98-169 (Vol. I), at 417 (1984).]

On August 28, 1981, petitioner filed a petition with the Public Service Commission of Indiana for a certificate of authority and an order approving and authorizing petitioner to: (1) Issue a note or notes in an amount not to exceed $75 million to Finance; (2) pay all expenses of issuance of its notes and the Euronotes connected therewith; and (3) apply the net cash proceeds from the loan of the Euronote proceeds as requested in the petition. Essentially, the petition provided that the

proceeds were to be added to petitioner's working capital for ultimate application to the cost of its construction project, including the payment of short-term borrowings made to provide funds for the construction project. Petitioner also stated the following in its petition to the Public Service Commission of Indiana:

> It is believed that the Notes issued in conjunction with the Finance Subsidiary's issue and sale of the Euronotes, could be issued at a relatively favorable interest rate compared to domestically issued, unsecured long-term debt of petitioner and would allow petitioner additional flexibility in funding its construction program.

On September 25, 1981, the Public Service Commission of Indiana issued a certificate of authority providing that petitioner was authorized to borrow the proceeds of the Euronote issue and, in return, was authorized to issue its note in an amount not to exceed $75 million to Finance, at an interest rate which would be 1 percent greater than that borne by the Euronotes. The certificate of authority also provided that petitioner could unconditionally guarantee the amount of principal, interest, and premium, if any, on the Euronotes in the event of a default by Finance and that the guaranty would be a direct unsecured obligation of petitioner and would rank equally and ratably with all other unsecured senior debt of petitioner.

On October 6, 1981, Finance was authorized by its managing director to issue and sell $70 million of guaranteed notes that

would be due October 15, 1988. This same day, petitioner's executive and finance committee authorized and approved the issuance of a $70 million note to Finance.

On October 15, 1981, Finance issued notes in the Eurobond market in the amount of $70 million, at an interest rate of 17-1/4 percent. The notes were listed on the stock exchange of the United Kingdom and the Republic of Ireland. The timely payment of the principal amount and the interest was unconditionally guaranteed by petitioner, and the notes contained a call option in 1985 for a 1.5-percent premium, and in 1986 for a .75-percent premium. Also on October 15, 1981, petitioner issued a $70 million, 18-1/4 percent note due on October 15, 1988, to Finance, and pursuant thereto, Finance remitted the net proceeds of the Euronote offering of $68,525,000 to petitioner.[3]

Petitioner and Finance issued a prospectus in connection with the Euronote offering that was dated October 7, 1981. The prospectus provided that prior to the Euronote issuance, petitioner was to contribute to Finance "cash or property in an aggregate amount sufficient to bring total stockholder's equity to $28,000,000."

---

[3]Finance's Euronotes were issued at a discount of $1,475,000, which Finance amortized over the term of the notes. The discount consisted of $875,000 (1.25 percent) original issuance discount, $262,500 (.375 percent) broker/manager commission, $262,500 (.375 percent) underwriter commission, and $75,000 for broker/manager out-of-pocket legal fees and expenses.

In connection with the issuance of the Euronotes, petitioner, Finance, and the Irving Trust Co. entered into an Indenture Agreement on October 15, 1981. This agreement elaborates on the form and terms of the Euronote issuance and on the responsibilities of the respective parties. The agreement provides, inter alia, that Finance's net worth will not be reduced to an amount that is less than 40 percent of the aggregate amount of its outstanding indebtedness.

Also in connection with the Euronote offering, Eichhorn, Eichhorn & Link issued a legal opinion letter dated October 7, 1981. Based upon certain representations by petitioner, the opinion letter stated that the Euronote holders would not be subject to U.S. income tax upon receipt of interest income from Finance, unless the holders were engaged in a U.S. trade or business. For purposes of this opinion letter, petitioner represented, inter alia, that the equity capital of Finance at the time of issuance of the Euronotes would not be less than $28 million, consisting of accounts receivable to be assigned to Finance, and that Finance's net worth would not at any time be reduced to an amount less than 40 percent of the aggregate amount of its outstanding indebtedness, so as to maintain at all times a debt-to-equity ratio not in excess of 2-1/2 to 1.

On October 15, 1981, petitioner and Finance executed a document captioned "Assignment of Accounts Receivable". This assignment was authorized by petitioner's board of directors on

September 22, 1981. The assignment document provides that petitioner assign all its "right, title and interest in and to the accounts receivable" of five of petitioner's largest customers: United States Steel Corp.; Inland Steel Co.; Jones & Laughlin Steel Corp.; Bethlehem Steel Corp.; and Midwest Steel Corp., a division of National Steel Corp. The assignment document also provides that petitioner will act as a collection agent for Finance with respect to the above accounts and that the above accounts

> do now and at all times will aggregate in excess of $28,000,000, and in the event a decline in the value of one or more of the accounts would cause the aggregate amount to be less than $28,000,000, * * * [petitioner] will promptly assign additional customer accounts sufficient that the aggregate of all assigned accounts will be in excess of $28,000,000.

On October 15, 1981, Eichhorn, Eichhorn & Link issued a second legal opinion reaffirming its letter dated October 7, 1981, and stating that in its opinion, Finance was capitalized as set forth in the prospectus.

Petitioner did not change the manner in which it recorded sales and accounts receivable information as a result of executing the assignment document. The moneys petitioner collected on the accounts receivable that were listed in the assignment document were not set aside in a special account, but were placed in petitioner's general corporate funds. Petitioner's audited financial statements covering September 1981

through September 1986 included the accounts receivable that were listed in the assignment document.

Petitioner did not send a letter notifying the account debtors of the execution of the assignment document, nor did petitioner file financing statements, as that term is defined in the Uniform Commercial Code. During the period the Euronotes were outstanding, petitioner engaged in no borrowing transactions in which any of its accounts receivable were pledged to an unrelated third party or otherwise subject to a security interest of an unrelated third party. The balance of the accounts receivable at all times relevant herein exceeded $28 million.

Finance received annual interest payments in 1982, 1983, 1984, and 1985 in the amount of $12,775,000 from petitioner. Finance made annual interest payments in the amount of $12,075,000 in 1982, 1983, 1984, and 1985 to the holders of the Euronotes. Finance's aggregate income on the spread between the Euronote interest and the interest on petitioner's note was $2,800,000. In addition, Finance earned interest income on its investments (exclusive of interest paid by petitioner on its note).

On October 10, 1985, petitioner repaid its note plus accrued interest and early payment premium to Finance. The payment consisted of $70 million in principal, $12,775,000 in interest for the period ending October 15, 1985, and a $1,050,000 call premium. On October 15, 1985, Finance redeemed the Euronotes by

paying $70 million in principal, $12,075,000 in interest, and a $1,050,000 call premium to the Euronote holders.

On September 22, 1986, Finance was liquidated. The distribution of Finance's assets to petitioner was completed sometime during 1987.

Petitioner timely filed Forms 1042 (U.S. Annual Return of Income Tax to be Paid at Source) for each of the years at issue. Petitioner also filed Forms 1042S (Foreign Person's U.S. Source Income Subject to Withholding) for all the payments reported on the Forms 1042. The interest payments made by Finance to the Euronote holders were not reported in petitioner's Forms 1042 and 1042S or on any schedule or statement attached to such returns.

OPINION

Section 871(a)(1) generally imposes a tax on nonresident aliens of 30 percent of the amount of interest received from sources within the United States. Section 1441(a) and (b) generally requires persons who pay such interest to deduct and withhold a tax equal to 30 percent of the amount thereof. Section 1461 makes the payor liable for this withholding tax.

Section 894 provides that to the extent required by any treaty obligation of the United States, income of any kind shall be exempt from taxation and shall not be included in gross income. See Tate & Lyle, Inc. v. Commissioner, 103 T.C. 656, 664 (1994). During the tax years at issue, article VIII of the

income tax treaty between the United States and the Netherlands, as extended to the Netherlands Antilles (Treaty), provided the following:

> (1) Interest on bonds, notes, debentures, securities, deposits or any other form of indebtedness * * * paid to a resident or corporation of one of the Contracting States shall be exempt from tax by the other Contracting State.  [Convention with Respect to Taxes, Apr. 29, 1948, U.S.--The Neth., art. VIII, 62 Stat. 1757, 1761, supplemented by Protocol, Oct. 23, 1963, 15 U.S.T. 1900, modified by Supplementary Convention, Dec. 30, 1965, 17 U.S.T. 896, 901.]

In light of this Treaty provision, if petitioner's interest payments are recognized as having been paid to Finance, Finance would not be liable for the tax imposed by section 871(a)(1), and petitioner would be under no obligation to withhold tax pursuant to section 1441.

Respondent determined that petitioner was required to withhold taxes pursuant to section 1441 on the interest payments to the Euronote holders.  Respondent's position is based on the proposition that Finance should be ignored and that petitioner should be viewed as having paid interest directly to the Euronote holders.  Respondent argues that Finance was a mere conduit or agent in the borrowing and interest-paying process.

Petitioner formed Finance for the purpose of borrowing money in Europe and lending money to petitioner.  Normally, a choice to transact business in corporate form will be recognized for tax purposes so long as there is a business purpose or the

corporation engages in business activity.  As stated by the

Supreme Court:

> The doctrine of corporate entity fills a useful
> purpose in business life.  Whether the purpose be to
> gain an advantage under the law of the state of
> incorporation or to avoid or to comply with the demands
> of creditors or to serve the creator's personal or
> undisclosed convenience, so long as that purpose is the
> equivalent of business activity or is followed by the
> carrying on of business by the corporation, the
> corporation remains a separate taxable entity. * * *
> [Moline Properties, Inc. v. Commissioner, 319 U.S. 436,
> 438-439 (1943); fn. refs. omitted.]

The alternative requirements of business purpose or business

activity have been restated many times.  With respect to the

latter requirement, the quantum of business activity may be

rather minimal.  Hospital Corp. of America v. Commissioner, 81

T.C. 520, 579 (1983).  Even where a corporation is created with a

view to reducing taxes, if it in fact engages in substantive

business activity, it will not be disregarded for Federal tax

purposes.  Bass v. Commissioner, 50 T.C. 595, 601 (1968).  This

is true even if the primary reason for the corporation's

existence is to reduce taxes.  As we stated in Nat Harrison

Associates, Inc. v. Commissioner, 42 T.C. 601, 618 (1964):

> Whether the primary reason for its existence and
> conduct of business was to avoid U.S. taxes or to
> permit more economical performance of contracts through
> use of native labor, or a combination of these and
> other reasons, makes no difference in this regard.  Any
> one of these reasons would constitute a valid business
> purpose for its existence and conduct of business as

long as it actually conducted business.[4] * * *

Considering these principles and the fact that Finance engaged in the business activity of borrowing and lending money at a profit, it would seem that Finance should be recognized as the recipient of interest paid to it by petitioner.

Of course, a corporate entity can act as an agent for its sole shareholder rather than for its own account.  But these instances have been rather narrowly restricted to situations where the corporation's role as an agent is made clear; e.g., where the agency relationship is set forth in a written agreement, the corporation functions as an agent, and the corporation is held out as an agent in all dealings with third parties related to the transaction.  <u>Commissioner v. Bollinger</u>, 485 U.S. 340 (1988).[5]  The facts before us do not fit this mold.

---

[4]See also <u>Ross Glove Co. v. Commissioner</u>, 60 T.C. 569, 588 (1973).

[5]In <u>Bass v. Commissioner</u>, 50 T.C. 595, 601 (1968), we observed:

Long ago, the Supreme Court held that when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail makes no difference tax-wise, observing that "Undoubtedly the great majority of corporations owned by sole stockholders are 'dummies' in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually."  <u>National Carbide Corp. v. Commissioner</u>, <u>supra</u> at 433; see <u>Chelsea Products, Inc.</u>, 16 T.C. 840, 851 (1951), affd. 197 F.2d

(continued...)

Respondent does not deny the corporate existence of Finance. Respondent's reason for treating Finance as a mere conduit or agent is that Finance was "not properly capitalized". The explanation of adjustments in the notice of deficiency states:

> It has been determined that your 100% owned foreign subsidiary, incorporated in the Netherlands Antilles, was not properly capitalized, therefore the interest paid by that subsidiary on debt obligations (Euronotes) is treated as being paid directly by you. Consequently, you are liable for the 30% withholding which was not withheld on interest payments made to the holders of the Euronotes * * * [Emphasis added.]

Respondent's argument that Finance was inadequately capitalized, and that this should result in ignoring it for tax purposes, appears to be based on Rev. Rul. 69-377, 1969-2 C.B. 231; Rev. Rul. 69-501, 1969-2 C.B. 233; Rev. Rul. 70-645, 1970-2 C.B. 273; and Rev. Rul. 73-110, 1973-1 C.B. 454. These revenue rulings basically recognize the validity of the debt obligation of wholly owned foreign financing subsidiaries in situations identical to the instant case, if the amount borrowed by the financing subsidiary does not exceed five times its equity capital.[6] Respondent would agree that petitioner is not liable

_____

[5](...continued)
620 (C.A.3, 1952).

[6]In Rev. Rul. 74-464, 1974-2 C.B. 47, respondent indicated that the mere existence of a 5-to-1 debt-to-equity ratio could no longer be relied upon by taxpayers.

(continued...)

for the withholding tax if Finance's debt-to-equity ratio does not exceed 5 to 1.[7]

Petitioner argues that its assignment of accounts receivable in an amount of at least $28 million was an equity investment in Finance that brings Finance well within the debt-to-equity ratio of 5 to 1.  Respondent argues that this assignment was not an equity investment because actual ownership of the accounts receivable was never transferred.  Before we launch any inquiry into the true nature of the assignment of petitioner's accounts receivable, we will first inquire into the legal basis for respondent's reliance on alleged inadequate capitalization as a

[6](...continued)
     In light of the inseparability of the IET [Interest Equalization Tax] and the five to one debt to equity ratio and resultant Federal income tax consequences, the expiration of the IET on June 30, 1974, eliminated any rationale for treating finance subsidiaries any differently than other corporations with respect to their corporate validity or the validity of their corporate indebtedness.  Thus, the mere existence of a five to one debt to equity ratio, as a basis for concluding that debt obligations of a finance subsidiary constitute its own bona fide indebtedness, should no longer be relied upon.  [Id.]

[7]As more fully discussed infra, sec. 127(g)(3) of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 652, provides a "safe harbor" from taxation for interest paid to a controlled foreign corporation if the requirements of the above-mentioned revenue rulings are met.  At trial, respondent's counsel acknowledged that the specific capital requirements of the revenue rulings outlined above were not based on statute or case law, except to the extent that compliance with them is required to come within the "safe harbor" provisions of DEFRA sec. 127(g)(3).

reason for treating Finance as a conduit.

Revenue rulings represent "merely the opinion of a lawyer in the agency and must be accepted as such", and are "not binding on the * * * courts." Stubbs, Overbeck & Associates, Inc. v. United States, 445 F.2d 1142, 1146-1147 (5th Cir. 1971); see Halliburton Co. v. Commissioner, 100 T.C. 216, 232 (1993), affd. without published opinion 25 F.3d 1043 (5th Cir. 1994). Accordingly, "a ruling or other interpretation by the Commissioner is only as persuasive as her reasoning and the precedents upon which she relies." Halliburton Co. v. Commissioner, supra at 232. The aforementioned revenue rulings contain no legal analysis supporting their debt-to-equity requirement. At trial, we asked respondent's counsel to explain the legal foundation and rationale upon which respondent's debt-to-equity position was based. Except for referring to the aforementioned revenue rulings, counsel was unable to provide an explanation at that time. In respondent's opening brief, respondent cited no legal authority supporting a debt-to-equity requirement.

Petitioner takes the position that a debt-to-equity ratio is irrelevant to whether a corporation is acting as a conduit or agent. In respondent's reply brief, she addresses petitioner's argument that the debt-to-equity ratio is irrelevant by attempting to distinguish the cases petitioner cited on the ground that they did not deal with the type of conduit/withholding transaction presented in this case.

Respondent's reply brief then states that

> in the case at bar, we are dealing with the question of debt to equity ratio in the context of a controlled foreign corporation, a financing subsidiary. The requirement of adequate capitalization serves as a major assurance that there is financial reality and substance to the transaction in the post Moline Properties, supra, era. [Fn. ref. omitted.]

However, respondent cites no authority for this proposition, nor does she explain what factors should be used in determining the existence of "adequate capitalization" in this situation. It would appear that this is an issue of first impression.

There is nothing in Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943), upon which respondent can rely. In that case, the taxpayer corporation was created and owned by an individual who had previously purchased real estate that he had mortgaged. The investment proved unprofitable, and in order to avoid losing the property, the individual owner was required by his creditors to transfer title to the newly formed corporation and place the corporate stock in trust as collateral. See Moline Properties, Inc. v. Commissioner, 45 B.T.A. 647 (1941), revd. 131 F.2d 388 (5th Cir. 1942), affd. 319 U.S. 436 (1943).

In Moline Properties, Inc. v. Commissioner, supra, the Supreme Court upheld the Commissioner's position that the corporate entity to which the real estate was transferred must be recognized and pay tax on the profit realized when it sold the real estate. There is nothing in Moline Properties that suggests

that the Supreme Court placed any significance on the ratio of debt to equity.  Indeed, from the facts presented in Moline Properties, one would suspect that the creditors required the transfer of real estate to the newly formed corporation, because the individual debtor/stockholder had insufficient equity to satisfy the creditors that the debts would be repaid.

Moline Properties, Inc. v. Commissioner, supra, stands for the general proposition that a choice to do business in corporate form will result in taxing business profits at the corporate level.  Neither party has directed our attention to precedent that conditions this proposition on a ratio of debt to equity. This does not mean that the relationship of debt to equity is necessarily irrelevant in cases where there is a challenge to a corporation's role.  But if the relationship of debt to equity is to be a significant factor for tax purposes, it seems to us that it must also have economic significance to the transaction being challenged.

In the instant case, if petitioner had invested sufficient equity capital in Finance to bring the debt-to-equity ratio to 5 to 1, respondent would have conceded.  Petitioner could have achieved this debt-to-equity ratio by contributing an additional $14 million to Finance.[8]  But since Finance's only business

---

[8]As previously noted, petitioner argues that it did achieve a 5-to-1 debt-to-equity ratio when it assigned at least $28 million of accounts receivable to Finance.

purpose was to borrow money in Europe and lend money to petitioner--and petitioner obviously needed the $14 million[9]--one would naturally expect that a $14 million capital contribution received by Finance would have been lent right back to petitioner. This would have presumably satisfied respondent's debt-to-equity ratio, and respondent would not have characterized Finance as a mere conduit.[10] In reality, however, nothing of economic significance would have occurred with respect to Finance's issuance of Euronotes. The financial stability of Finance and the position of the Euronote holders would have been substantially unchanged. Both would have ultimately remained dependent upon petitioner's ability to pay its notes to Finance, so that Finance could in turn pay off the Euronotes.

The legislative history of DEFRA describes the manner in which domestic corporations accessed the Eurobond market:

> In general, debt securities in the Eurobond market are free of taxes withheld at source, and the form of bond, debenture, or note sold in the Eurobond market puts the risk of such a tax on the issuer by requiring the issuer to pay interest, premiums, and principal net of any tax which might be withheld at source (subject to a right of the issuer to call the obligations in the

[9]The whole purpose of Finance was to facilitate petitioner's borrowing $70 million.

[10]Respondent did not contend on brief that a financing subsidiary would be lacking in substance if it lent its capital back to its parent, and nothing in respondent's revenue rulings indicates the manner in which a financing subsidiary is required to invest its capital.

event that a withholding tax is imposed as a result of a change in law or interpretation occurring after the obligations are issued). Because the Eurobond market is generally comprised of bonds not subject to withholding tax by the country of source, an issuer may not be able to compete easily for funds in the Eurobond market solely on the basis of price if its interest payments are subject to a substantial tax. U.S. corporations currently issue bonds in the Eurobond market free of U.S. withholding tax through the use of international finance subsidiaries, almost all of which are incorporated in the Netherlands Antilles.

Finance subsidiaries of U.S. corporations are usually paper corporations, often without employees or fixed assets, which are organized to make one or more offerings in the Eurobond market, with the proceeds to be relent to the U.S. parent or to domestic or foreign affiliates. The finance subsidiary's indebtedness to the foreign bondholders is guaranteed by the U.S. parent (or other affiliates). Alternatively, the subsidiary's indebtedness is secured by notes of the U.S. parent (or other affiliates) issued to the Antilles subsidiary in exchange for the loan proceeds of the bond issue. Under this arrangement, the U.S. parent (or other U.S. affiliate) receives the cash proceeds of the bond issue but pays the interest to the Antilles finance subsidiary rather than directly to the foreign bondholders. [S. Prt. 98-169 (Vol. I), at 418 (1984).]

The above description closely corresponds to the manner in which petitioner sought access to the Eurobond market.

Petitioner wanted to take advantage of favorable Eurobond interest rates. However, prospective lenders did not want to be liable for the 30-percent tax imposed by section 871(a)(1). Prospective lenders were willing to lend money to Finance because it was a Netherlands Antilles corporation whose notes would not be subject to tax under section 871(a)(1). The business purpose of Finance was to borrow money in Europe at a favorable rate and lend money to petitioner. For its involvement, Finance would

derive a profit equal to 1 percent of the amount lent to petitioner; i.e., the difference between 17-1/4 percent and 18-1/4 percent interest.  Obviously, the Euronote purchasers were willing to buy Finance's notes without requiring that any additional equity capital be invested in Finance.  Therefore, regardless of how petitioner's assignment of accounts receivable is characterized, petitioner's equity investment in Finance was "adequate" to carry out Finance's business purpose.[11]

Respondent relies almost exclusively on Aiken Indus., Inc. v. Commissioner, 56 T.C. 925 (1971).  In Aiken Indus., a domestic corporation (U.S. Co.) borrowed $2,250,000 at an interest rate of 4 percent on April 1, 1963, from a Bahamian corporation (Bahamian).  Bahamian owned 99.997 percent of U.S. Co.'s parent, also a domestic corporation, which in turn wholly owned U.S. Co. On March 30, 1964, Bahamian's wholly owned Ecuadorian subsidiary incorporated Industrias Hondurenas S.A. de C.V. (Industrias) in the Republic of Honduras.  On March 31, 1964 (which appears to be 1 day before U.S. Co.'s first interest obligation to Bahamian was due), Bahamian assigned U.S. Co.'s note to Industrias in exchange for nine promissory notes ($250,000 each), which totaled $2,250,000 and bore interest of 4 percent.  Because of this

---

[11]Cf. Bradshaw v. United States, 231 Ct. Cl. 144, 683 F.2d 365, 374 (1982) (citing Gyro Engg. Corp. v. United States, 417 F.2d 437, 439 (9th Cir. 1969); Piedmont Corp. v. Commissioner, 388 F.2d 886, 890 (4th Cir. 1968), revg. T.C. Memo. 1966-263; Sun Properties, Inc. v. United States, 220 F.2d 171, 175 (5th Cir. 1955)).

assignment, U.S. Co. made its 4-percent interest payments to Industrias, and Industrias made its 4-percent interest payments to Bahamian. Prior to the assignment, U.S. Co.'s interest payments to Bahamian would have been subject to the withholding provisions of section 1441. But after the assignment, because there was an income tax treaty between the United States and the Republic of Honduras, U.S. Co. claimed exemption from the withholding provisions.

In Aiken Indus., Inc. v. Commissioner, supra, we held that the corporate existence of Industrias could not be disregarded. However, we also held that the interest payments in issue were not "received by" Industrias within the meaning of the article of the United States-Honduras Income Tax Treaty that exempted interest from tax. Id. at 933. In Aiken Indus., Inc. v. Commissioner, supra at 933-934, we stated:

> The words "received by" refer not merely to the obtaining of physical possession on a temporary basis of funds representing interest payments from a corporation of a contracting State, but contemplate complete dominion and control over the funds.
>
> The convention requires more than a mere exchange of paper between related corporations to come within the protection of the exemption from taxation * * *, and on the record as a whole, the * * * [taxpayer] has failed to demonstrate that a substantive indebtedness existed between a United States corporation and a Honduran corporation.
>
> * * * Industrias obtained exactly what it gave up in a dollar-for-dollar exchange. Thus, it was committed to pay out exactly what it collected, and it made no profit on the * * * [exchange of the notes]

* * *

In these circumstances, where the transfer of * * * the notes * * * left Industrias with the same inflow and outflow of funds and where * * * [all involved] were * * * members of the same corporate family, we cannot find that this transaction had any valid economic or business purpose. Its only purpose was to obtain the benefits of the exemption established by the treaty for interest paid by a United States corporation to a Honduran corporation. While such a tax-avoidance motive is not inherently fatal to a transaction, see Gregory v. Helvering, * * * [293 U.S. 465, 469 (1935)], such a motive standing by itself is not a business purpose which is sufficient to support a transaction for tax purposes. See Knetsch v. United States, 364 U.S. 361 (1960); Higgins v. Smith, 308 U.S. 473 (1940); Gregory v. Helvering, supra.

The fact that the transaction was entirely between related parties was important to our conclusion that it was void of any "economic or business purpose." Aiken Indus., Inc. v. Commissioner, supra at 934. In contrast, Finance borrowed funds from unrelated third parties (the Euronote holders) who were willing to enforce their rights over both Finance and petitioner. The Euronote holders would not have lent money to petitioner. Finance was therefore created to borrow money in Europe and then lend money to petitioner in order to comply with the requirements of prospective creditors, a business purpose of the kind recognized by the Supreme Court in Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943).

The instant case is also distinguishable from Aiken Indus., because Finance's borrowing and lending activity was a business activity that resulted in significant earnings for Finance.

Petitioner was required to pay interest at 18-1/4 percent, whereas Finance issued the Euronotes at 17-1/4 percent. Finance's aggregate income on the spread between the Euronote interest and the interest on petitioner's note was $2,800,000. In addition, Finance earned interest income on its investments (exclusive of interest received from petitioner) during its existence.[12]

Moreover, in Aiken Indus., this Court did not rely upon, or even mention, lack of adequate capitalization as a reason for treating Industrias as a conduit. Since respondent's determination was based on her finding that Finance was "not properly capitalized," respondent's reliance on Aiken Indus. is misplaced.

Respondent next argues that

> in 1984 Congress had the option of retroactively grandfathering all foreign subsidiaries and eliminating all withholding tax on bond interest had it chosen to do so. Instead, it opted for the safe harbor provision contained in section 127(g)(3) which expressly referenced the rulings requiring a debt equity ratio of no more than five-to-one for financing subsidiaries utilized prior to the effective date of the Act. The intent of Congress, as reflected in this safe harbor

---

[12]Compare Morgan Pac. Corp. v. Commissioner, T.C. Memo. 1995-418, in which the taxpayer conceded, based on Aiken Indus., Inc. v. Commissioner, 56 T.C. 925 (1971), that a Netherlands Antilles corporation should be treated as a conduit. The transactions in Morgan Pacific are distinguishable from those in the instant case. Among other things, the interest payments received and paid by the Netherlands Antilles corporation in Morgan Pacific were identical and the transactions did not involve parties unrelated to petitioner.

provision, is consistent with respondent's scrutiny of petitioner's debt to equity ratio and should be carried out. [Emphasis added.]

The Deficit Reduction Act of 1984 significantly modified withholding requirements with respect to "interest received by foreigners on certain portfolio investments." DEFRA sec. 127, 98 Stat. 648. These provisions essentially provided U.S. taxpayers direct tax-free access to the Eurobond market. The amendments made by DEFRA section 127 generally applied to "interest received after the date of the enactment of this Act with respect to obligations issued after such date, in taxable years ending after such date." DEFRA sec. 127(g)(1), 98 Stat. 652. However, DEFRA section 127(g)(3), 98 Stat. 652-653, established safe harbor rules applicable to certain controlled foreign corporations in existence on or before June 22, 1984:

> (A)  In General.--For purposes of the Internal Revenue Code of 1954, payments of interest on a United States affiliate obligation to an applicable CFC in existence on or before June 22, 1984, shall be treated as payments to a resident of the country in which the applicable CFC is incorporated.
>
> (B)  Exception.--Subparagraph (A) shall not apply to any applicable CFC which did not meet requirements which are based on the principles set forth in Revenue Rulings 69-501, 69-377, 70-645, 73-110.

Thus, respondent argues that for the safe harbor rules to apply, the controlled foreign corporation must have met the 5-to-1 debt-to-equity ratio as set forth in Rev. Rul. 69-377, 1969-2 C.B.

231; Rev. Rul. 69-501, 1969-2 C.B. 233; Rev. Rul. 70-645, 1970-2 C.B. 273; and Rev. Rul. 73-110, 1973-1 C.B. 454.

Petitioner agrees that in order to fall within the safe harbor provisions, Finance had to meet the debt-to-equity ratios as set forth in the above revenue rulings. Petitioner nevertheless contends that "there is nothing in the 1984 Act, as amended, or the accompanying legislative history, which suggested that compliance with this safe harbor was the only method a United States corporation could utilize in claiming an exemption from U.S. withholding tax or interest paid to controlled foreign finance subsidiaries." Accordingly, petitioner contends that irrespective of the capital requirements set forth in the rulings, if the situation before us falls within the terms of the Treaty, it is not liable for the withholding tax. We agree.

The legislative history of DEFRA describes in some detail the practice of U.S. corporations seeking access to the Eurobond market. The legislative history notes that the offerings by finance subsidiaries (mostly all of which were incorporated in the Netherlands Antilles) "involve difficult U.S. tax issues in the absence of favorable IRS rulings." S. Prt. 98-169 (Vol. I), at 419 (1984). Indeed, the legislative history outlined the arguments supporting the position taken by taxpayers and the arguments supporting the Government's position with respect to these "difficult U.S. tax issues".

Notwithstanding this, no conclusion was drawn regarding the

merits of either position.  In fact, the legislative history states that "these finance subsidiary arrangements do in form satisfy the requirements for an exemption from the withholding tax and a number of legal arguments would support the taxation of these arrangements in accordance with their form."  S. Prt. 98-169 (Vol. I), at 419 (1984).  Lastly, the legislative history states:

> No inference should be drawn from this rule regarding the proper resolution of other tax issues.  The conferees do not intend this provision to serve as precedent for the U.S. tax treatment of other transactions involving tax treaties or domestic tax law.  [H. Conf. Rept. 98-861, at 938 (1984), 1984-3 C.B. (Vol. 2) 1, 192; emphasis added.]

See also S. Prt. 98-169 (Vol. I), at 418 n.1 (1984).

The fact that Congress made the safe harbor provisions of DEFRA section 127(g)(3) contingent on meeting the requirements of preexisting revenue rulings does not mean that such requirements must be met in order for the legal substance of these financing transactions to be recognized.  Congress was presumably trying to provide a safe harbor for taxpayers who had complied with the revenue rulings.  As already indicated, Congress did not intend DEFRA section 127(g)(3) to be the exclusive means by which a taxpayer could claim exemption from the 30-percent withholding tax.  Moreover, Congress drew no conclusions regarding the respective positions taken by taxpayers and the Government on whether these transactions would qualify for exemption from

withholding tax.  Based on this, we are not convinced that Congress was attempting to impart legitimacy to the debt-to-equity ratio that was required by the revenue rulings.[13]

_____

[13]In Rev. Rul. 84-153, 1984-2 C.B. 383, the Commissioner took the position that a Netherlands Antilles financing subsidiary was a mere conduit for interest payments to foreign bondholders even though the subsidiary was adequately capitalized.  The facts in Rev. Rul. 84-153, supra, are essentially as follows:  (1)  P, a corporation organized under the laws of the United States, owned 100 percent of the stock of S, an Antilles corporation; (2) to upgrade the production facilities of P's wholly owned domestic subsidiary, R, S sold bonds to foreign persons in public offerings outside the United States on Sept. 1, 1984; (3) S lent the proceeds from the bond offerings to R at a rate of interest that was 1 percentage point higher than the rate payable by S on the bonds; (4) R made timely payments to S and S made timely payments to its bondholders; (5) S's excess revenue after expenses was retained by S; (6) neither P, R, nor S was thinly capitalized.  The revenue ruling does not mention any debt-to-equity ratio, nor does it explain the meaning of "thinly capitalized".  The revenue ruling concludes:

> In substance, S, while a valid Antilles corporation, never had such dominion and control over R's interest payments, but rather was merely a conduit for the passage of R's interest payments to the foreign bondholders.  The primary purpose for involving S in the borrowing transaction was to attempt to obtain the benefits of the Article VIII(1) interest exemption for interest paid in form by R, a domestic corporation, to S, an Antilles corporation, thus, resulting in the avoidance of United States tax.  This use of S lacks sufficient business or economic purpose to overcome the conduit nature of the transaction, even though it can be demonstrated that the transaction may serve some business or economic purpose.  See Gregory v. Helvering, 293 U.S. 465 (1935), and Aiken Industries, Inc., v. Commissioner, supra.  * * *  [Rev. Rul. 84-153, 1984-2 C.B. at 384.]

It is clear from this that the Commissioner would treat a Netherlands Antilles finance corporation as a conduit, regardless

(continued...)

Based on the facts and circumstances before us, we hold that Finance did not act as a conduit or agent with respect to the transactions in issue. It follows that petitioner was not required to withhold tax on interest payments to the Euronote holders.[14]

Decision will be entered

for petitioner.

---

[13](...continued)
of whether it was adequately capitalized. However, Rev. Rul. 84-153, supra, was modified by Rev. Rul. 85-163, 1985-2 C.B. 349, as follows:

> Pursuant to the authority contained in section 7805(b) of the Internal Revenue Code, the holdings of * * * Rev. Rul. 84-153 will not be applied to interest payments made in connection with debt obligations issued prior to October 15, 1984, the date that * * * Rev. Rul. 84-153 [was] published * * *

Finance issued its Euronotes on Oct. 15, 1981, approximately 3 years prior to the effective date of Rev. Rul. 84-153, as modified by Rev. Rul. 85-163.

[14]As a result of our conclusion, we need not address petitioner's alternative argument that Finance met the capital requirements of DEFRA sec. 127(g)(3) by virtue of the assignment of petitioner's accounts receivable.